317 P.3d 1

Eric J. MINTON and Richard M. Stanley,
Petitioners/Plaintiffs–Appellants,

v.

Sidney A. QUINTAL, John C. Fuhrmann,
City and County of Honolulu, Respon-
dents/Defendants–Appellees.

No. SCWC–11–0000317.

Supreme Court of Hawaiʻi.

Dec. 13, 2013.

As Corrected Dec. 27, 2013.

Charles S. Lotsof and Jack F. Schweigert, Honolulu, for petitioners.

Curtis E. Sherwood, for respondents.

RECKTENWALD, C.J., NAKAYAMA, and POLLACK, JJ., Circuit Judge CASTAGNETTI, in place of ACOBA, J., Recused, and Circuit Judge KIM, in place of McKENNA, J., Recused.

Opinion of the Court by POLLACK, J.

This appeal arises from the actions of Respondents/Defendants–Appellees Sidney A. Quintal, John C. Fuhrmann, and the City and County of Honolulu (City) (collectively, "Respondents") to ban two stagehands, Petitioners/Plaintiffs–Appellants Eric J. Minton and Richard M. Stanley (collectively, "Petitioners"), from working at certain City-owned facilities based on their involvement in a charitable concert featuring the City's mayor. Petitioners challenged the ban as an abuse of Respondents' authority, a violation of due process, and as tortious interference with their prospective business advantage. Following a jury-waived trial, the Circuit Court of the First Circuit (circuit court) entered a final judgment in favor of Respondents on all claims, holding that the ban was rationally related to the City's interest in leasing the City's venues, that Petitioners had shown no constitutionally-protected right to engage in their chosen profession at such venues, and alternatively that Petitioners failed to present credible evidence supporting their tort claim. The Intermediate Court of Appeals (ICA) affirmed, determining that Respondents had inherent authority to institute the ban as part of the operations and management of the City's facilities, and Petitioners asserted no cognizable property or liberty interest.

For the reasons stated herein, we hold that the City's ban interfered with Petitioners' liberty interests under article I, section 5 of the Hawai'i Constitution, and the City failed to satisfy due process by instituting the ban without affording Petitioners notice and an opportunity to be heard. Accordingly, we vacate the ICA and circuit court judgments and remand the case for proceedings consistent with this opinion.

## I.

The Department of Enterprise Services (DES) is a City department that manages and leases certain City facilities, including the Neal S. Blaisdell Center (NBC) and the Waikiki Shell Amphitheater (Waikiki Shell). Respondent Quintal was the Director of the DES at the time of the pertinent events, and reported directly to Honolulu Mayor Muliufi "Mufi" Hannemann (Mayor). Respondent Fuhrmann was the Auditoriums Events and Services Manager for the DES. He was responsible for managing the daily operations of the DES facilities and reported directly to Quintal.

The DES generates revenue for the City by leasing its venues. The City does not provide the personnel required for events but refers event promoters to the Local 665 Union, which is the Honolulu chapter of the International Association of Theatrical Stage Employees (IATSE), a union representing theater and stage workers. The union functions "as a business agent" that "receive[s] and fill[s] requests for qualified theatrical and stage professionals from its union membership" for events held in Hawai'i. The City does not have a formal contractual agreement with the IATSE.

At the time of the underlying events in this case, Minton had about fifty years of stage and theater experience. He has been a member of the Local 665 union since 1972. Minton worked primarily as a stagehand, a worker who shifts scenery, adjusts lighting, and performs other tasks required in theatrical productions, shows, and events. He also routinely worked as a crew chief, the person that "the construction company will deal with to coordinate the actions of all the crew."

Stanley had about twenty-three years of experience. He worked primarily as a sound technician, responsible for recording, transmitting or amplifying sound.

## A.

In 2007, the Aloha Medical Mission (AMM), a charitable organization, entered into a standard lease with the DES to rent the NBC concert hall for a fundraiser event on August 18, 2007, entitled "Four Doctors, A Patient and the Mayor." The event was a concert with musical performances, including a solo singing performance by the Mayor.

The NBC concert hall is equipped with a City-owned public address sound system, as well as stage, lighting and other specialized equipment. The City offers lessees the option of utilizing the City's equipment or bringing in outside equipment. The AMM contracted to use the City's house sound system.

The house sound system was at least twenty years old at that time. Stanley testified that the sound system was "lacking." He explained that the mixing board that came with the house sound system was "[e]xtremely limited," and he "lived in fear that every time [he used it], that it would break down before the job was over."

The AMM hired J.P. Orias, an event promoter, as the production manager for the event. The AMM had hired him as a production manager for two prior events. He had worked with Minton on both prior shows and found Minton's services to be satisfactory.

Minton and Stanley were both hired to work on the August 18 show through the Local 665 referral system. Minton had worked as the crew chief at the prior AMM shows, and he was again hired in that capacity. Stanley was hired as a sound technician.

Orias testified that because this was a fundraiser for a medical mission "and not a high-powered mega show," he was limited to a strict budget and everything he did was required to be approved by an AMM committee. Both Minton and Stanley were aware of AMM's limited budget. In order to save money, the AMM employed a "short crew" of six stagehands for a production that normally would have involved about sixteen to twenty stagehands.

The AMM scheduled three rehearsals with the stage crew to take place on August 13 and 14, as well as on the day of the show. According to Minton, "[f]or a show of this size and complexity," normally "at least five rehearsals" with the stage crew would have been held.

The Mayor attended the second rehearsal on August 14, 2007. At that point, the plan was for the Mayor to be accompanied by a pianist, bass player and drum set player.

During the rehearsal, the stage crew had several encounters with the Mayor's brother, Nephi Hannemann. In one incident, Nephi wanted the stage crew to move the theater's cyclorama, which is a white screen on which images are projected. Minton testified that the cyclorama "probably weighs 2000 pounds," and he "very politely" informed Nephi that the screen could not be moved because only two men were available to move it and moving the screen would require seven men. According to Minton, Nephi responded by commenting that Minton "didn't want to do any work[.]"

In addition, Nephi was "unhappy with the sound system being used," and expressed that "he wanted a sound system comparable to that used by the Society of Seven."

Minton testified that it was Orias' decision to use the City's wireless microphones for the AMM event. Minton "strongly recommended that if the producer insisted on using cordless microphones, they not use the Sony microphones" provided by the City because the equipment "was low-quality and unsuitable." Orias confirmed that Minton cautioned him not to use the City's wireless microphones. Based on Minton's advice, Orias rented four wireless microphones from an independent source.

The night before the concert the Mayor held an unscheduled rehearsal at the NBC. Orias had no prior warning about the rehearsal and was not present. In addition, no one on the stage crew, including Minton and Stanley, was present at the rehearsal or aware that the rehearsal took place.

The final scheduled rehearsal took place on the morning of the show. That day, Orias found out that a five-piece band had been added to the show at the last minute to accompany the Mayor during his solo performance. Minton and Stanley were informed of the band's addition when they arrived for the rehearsal. The new instruments were two guitars, a bass player, keyboard, and second drum set.

Minton testified that the last-minute addition of the band was "[t]otally overwhelming" because the crew had planned the number of microphones that would be necessary, the

172

size of the system console that would handle all of the microphones, and how the stage would be set up based on the information that had been provided previously. Stanley also testified that the band caused problems because the additional instruments required extra inputs for the microphones. Because of the addition of the Mayor's band, Stanley had to switch the inputs during the show for each particular music group as opposed to having everything set up beforehand. Due to the addition of the Mayor's band, the AMM used the City's wireless microphones, although Orias had not wanted to use them based on Minton's recommendation.

During the last rehearsal, the stage crew again encountered several problems with Nephi. Minton testified that Nephi expressed that he wanted the on-stage piano to be moved during the show. Minton responded that this was not possible because the piano had been specially placed on the stage and moving it would cause the piano to fall out of tune. Minton testified that Nephi made "a very nasty comment to me that I just didn't want to do any work."

In addition, Minton testified that Nephi "wasn't satisfied with how [the] rehearsal was going," and at one point Nephi approached him to "order [him] to bring the sound man down to the floor." Minton explained that this "would have been foolish, risky," because "[i]f the system went into feedback ... it could damage the gear[.]" Moreover, Stanley would have been able to hear what the sound was like in the auditorium "by extending his head out of the [sound] booth" rather than coming down to the stage. Minton told Nephi that Stanley "was working with it, give him a chance to get it done," and Nephi responded by "storming off." Minton related that he was courteous during all of his interactions with Nephi, saying, "Yes, sir. No, sir."

Stanley testified that he came out of the sound booth several times during the rehearsals. He had discussions with Nephi down at the stage in which he explained the limitations of the house sound system. Stanley stated that the best place in the auditorium to conduct a sound check was the upper balcony. Additionally, Stanley echoed Min-

ton's concern that leaving the sound board unattended while it was turned on (in order to hear the sound from the stage, as Nephi wanted) would create the risk of a "massive feedback, which could mount to the point where it ... hurt the equipment."

Matthew K. Lyons, a stagehand who had been a member of the Local 665 Union for thirty years, testified that he worked on the AMM show as a "fly man," a person who moves the "drops" (sic) in the concert hall. During the Mayor's rehearsal, Nephi approached him and another stagehand and told them to move the microphones around on the stage for the Mayor. Lyons and the second stagehand responded, "[W]e already got it under control." According to Lyons, Nephi "came back at me like I was trying to pick a fight with him or something," and Nephi "wanted to actually take me outside and fight me[.]" Lyons responded, "[Y]ou need to go outside and take a breath." Nephi then left to wait for the Mayor to finish rehearsing.

Minton also testified that he observed Nephi "hassling" Lyons: "I heard a comment about let's go outside, and I thought ... he also intended to pick a fight. I heard [Lyon's] comment about, you know, you need to cool off, and he just stayed put."

The concert was held as scheduled later that day. Gary Sprinkle and Pamela Young, local TV personalities, served as the emcees.

There were some problems during the concert related to sound, including feedback from the wireless microphones, a "drop out" of sound from the Mayor's City-owned wireless microphone during the Mayor's performance, and a faulty connection for the guitar in the Mayor's backup band. Regarding the feedback, Stanley testified that during the speaking portions of the show, "a wireless condenser type of mike of not the best quality was used," which was susceptible to causing feedback. Stanley also explained that it had not been mentioned that the doctors would be speaking between their musical performances, until he read the script on the day of the show. Thus, at that rehearsal "[t]here was pretty much an on-the-fly training program with [Minton]" trying to get the

doctors to enunciate and be audible to the audience. Stanley testified that "it was obvious that these doctors were not professional speakers at all, they were practically whispering ... into the microphones, and that made it very difficult to make them audible." At the concert, none of the feedback occurred during a musical piece. Stanley testified that there was "a very short burst of feedback" between musical performances when "inexperienced speakers" were "whispering into the mike," and Stanley was attempting to make them more audible.

In regard to the "drop out" of sound, during the Mayor's singing performance, "the City-owned wireless microphone experienced a momentary though noticeable loss of signal or 'drop out' where the Mayor's voice was not audible." Minton believed that this "drop out" was caused when the Mayor walked beyond the maximum range of the wireless microphone's transmitter.

Also during the Mayor's song, a single guitar input failed due to a defective wall-jack connection caused by the additional input demands from the Mayor's back-up band. Stanley testified that as soon as he noticed that he was not hearing the guitar in the sound booth, he communicated that to the stage crew, which was all he could have done. Minton received Stanley's communication regarding the loss of signal, and immediately told Lyons that there was a problem. Lyons walked on stage to check the problem, came back to get an extra cable, and replaced one of the circuits. Minton explained that it would have been "disastrous" to allow the act to go forward without fixing the faulty signal for the guitar because "[y]ou have a missing performer that the audience is not hearing[.]"

Lyons testified that he was wearing black clothing, as stagehands typically do in order to blend into the backdrop. Minton and Orias confirmed that Orias had asked all of the crew members on the floor to wear a t-shirt with the show logo on it.

Minton testified that the show was of "appropriate quality" for a "community amateur show." After the concert, the Mayor approached him, shook his hand "and said thank you very much, job well done." The Mayor acknowledged that his custom was to "always thank everyone involved." The Mayor also stated that the "glitch" causing the drop-out from his microphone "was the only thing that I was aware of that did not go as perfectly as I would [have] liked it to have gone," but despite the glitch, "everyone was happy[.]"

B.

1.

On August 21, 2007, Orias sent an email to Fuhrmann and Donovan Ahuna, Local 665's business agent. As the business agent, Ahuna was responsible for representing the union members' "interests in discussions and negotiations with employers."

In the email, Orias wrote that the sound at the AMM show was "Very Bad," explaining that there was a high-pitched "hissing sound ... that the sound crew was not able to correct to the end," and a "feedback almost everytime [sic] the center mic was used by the pianists to speak." The same center microphone also "cut off and on" several times during a mandolin performance. Orias noted that except for the four microphones that the AMM rented from an outside source, all of the equipment used for the event belonged to the City.

In addition, Orias stated that he was "reassured by the crew that the house equipment would be sufficient" and that "[t]he hissing and feedback did not happen during the afternoon test." Minton later testified that although he did assure Orias that the house equipment was sufficient, he made that statement prior to the addition of the Mayor's back-up band and was not referencing the City's wireless microphones, as he clearly informed Orias that the microphones were "not the caliber [Orias] needed."

Orias concluded his August 21, 2007 email by asking for an explanation of what had happened "from anyone who could lend some light" and stating that he had received "a lot of unfavorable comments" about the show. Orias did not mention Minton or Stanley or any member of the stage crew in his email. Orias also did not mention any allegations

that members of the stage crew were rude or unprofessional.

Orias later explained that he sent the email although he "knew more or less what was causing" the "glitches" because he wanted an official explanation to give the AMM committee, which "was asking what happened." Orias testified that no complaints regarding unprofessional conduct involving Minton, Stanley, or any member of the stage crew were brought to his attention.

Ahuna responded to Orias by email that same day, with Furhmann copied on the email. The email attached what appeared to be brief oral statements made by Minton, Stanley, and Ahuna, explaining what had happened with the sound during the concert. Petitioners testified that they were made aware of Orias' email but did not consider the email to be a personal criticism of their work. They both believed that they were only being asked to comment on the technical problems with the equipment to prevent the same problems from reoccurring.

Orias replied by email on August 23, 2007, questioning whether it would have been possible for the crew to fix the "humming" sound during the show's intermission by changing the wireless microphone to a wire setup. Ahuna responded that "maybe it could have been possible," but "all 16 channel wire-mics [were] in use due to the additional band gear."

Orias was satisfied with the explanations that were given. It was his belief that the stage crew was not responsible for the sound problems. Rather, Orias believed that the stress on the house sound system was "just too much, because we ha[d] so many mikes open and the set was old." Despite the sound problems, Orias considered the event "a good show, ... people enjoyed it, there was some standing ovation."

### 2.

On August 24, 2007, the Mayor called Fuhrmann and Quintal for a meeting about the show. Fuhrmann explained that he and Quintal "were called to the mayor's office,

... and the mayor made a complaint," saying that "he was very unhappy with what had happened at the show." According to Furhmann, the Mayor specifically had a problem with Minton and Stanley, mentioning that Minton "kept giving him excuses" about the feedback and refused to "talk to the sound man and get [the feedback] to be stopped." The Mayor also stated that Minton was "rude and ... improperly dressed" because "he was in a T-shirt on stage in a public arena when people could see him[.]" Additionally, the Mayor specified that Stanley had remained in the sound booth "and wasn't even hearing what was going on[.]"

The Mayor confirmed that he "did voice concern of the lack of professionalism that occurred during rehearsal as well as the performance," particularly with regard to Minton. According to the Mayor, however, this was "a very manini thing in the things that I do as mayor"[1] and the discussion of the concert "probably took two minutes."

Quintal assigned Fuhrmann to "investigate" the matter, instructing Fuhrmann, "I need to find out as many of the facts surrounding the incident and the complaints." At this point, neither Minton nor Stanley were aware that the Mayor was involved or that the City was conducting an investigation into their work at the concert.

### 3.

On August 30, 2007, the City held an event involving the Mayor, called "The Employees Recognition Program," at the NBC concert hall. On August 28, 2007, Fuhrmann emailed Ahuna to have Al Omo, the President of the Local 665 Union, assigned to the event in place of Minton and to have another union member assigned in place of Stanley. This change was confirmed by an August 29, 2007 letter from the City's Department of Human Resources to Ahuna.

On August 30, 2007, Quintal and Fuhrmann met with Ahuna and Omo. At the conclusion of the meeting, Quintal informed Ahuna and Omo that Stanley and Minton were no longer permitted to work at the NBC facili-

---

1. "Manini" is a slang term meaning "small" or "insignificant." Dictionary.com, http://dictionary. reference.com/browse/manini (last accessed November 7, 2013).

ties. Fuhrmann testified that "Mr. Quintal went through and explained to them what the issues were, what he was concerned about, and what his decision had been on the matter. That's basically what was discussed at the meeting." After Quintal explained that Minton and Stanley "would be suspended for a while, Mr. Ahuna and Mr. Omo asked how long, and Mr. Quintal said he would get back to them on that." Fuhrmann testified that "it wasn't a very long meeting" and "It wasn't a real discussion on the situation."

On August 31, 2007, Quintal sent a letter to Ahuna "to confirm our discussion yesterday about complaints received from the promoter [Orias]." Quintal explained that "the promoter was extremely unhappy" with Minton's and Stanley's actions and that based on his "findings," they "showed a complete disregard" for "customer service and professionalism." Consequently, Minton and Stanley were prohibited from working "at any events" at the NBC concert hall, exhibition hall and arena, and the Waikiki Shell:

> As I conveyed, the promoter was extremely unhappy with the way he and his event staff and performers were treated by your personnel (Eric Minton and Rick Stanley). I have completed an investigation of these allegations and thank you for your response to John Furmann's request for information from I.A.T.S.E. You also have a copy of the promoter's email.
>
> One of the most important areas that we at the Blaisdell Center concentrate on is customer service and professionalism. If you will recall, I have mentioned this in previous meeting between myself, John Furmann and your Board. Based on my findings, the actions of Mr. Minton and Mr. Stanley on the night of August 18, 2007 showed a complete disregard in these areas. Consequently, both Mr. Minton and Mr. Stanley will no longer be allowed to work at any events at the Neal Blaisdell Concert Hall, Exhibition Hall, Arena, and the Waikiki Shell.

(Emphases added).

No hearing or meeting with Petitioners was held prior to Quintal's decision.

Fuhrmann testified that the "investigation" he conducted at Quintal's direction consisted of speaking to Orias once on the phone, reviewing Orias' email, and sending a letter to the Local 665 union and reviewing their response.[2] Furhmann testified that he did not realize, until informed at his July 6, 2009 deposition, that the stage crew's attire, specifically the t-shirts, were provided by Orias. Additionally, Fuhrmann testified that he was not present at the AMM concert, and as of the date of his deposition, he had never listened to or viewed a reproduction of the show. Quintal testified that he was not aware that Fuhrmann did not, as part of his investigation, review the DVD of the performance.

Fuhrmann did not make a written report of his "investigation." Quintal testified that he did not think it was strange to not have a written report because he and Fuhrmann "sat down and we discussed all of the aspects of the situation." Fuhrmann, on the other hand, stated that "there was no real discussion about that issue. Did we discuss back and forth whether this [ban] should happen? No." Fuhrmann reiterated that Quintal did not ask for his input before instituting the ban against Minton and Stanley.

For his part, Quintal testified that he was also not present at the concert. At the time he sent the August 31 letter, he had watched only a portion of the movie of the concert, showing Lyons walking on the stage. He did not consult anyone other than Fuhrmann on whether it was inappropriate for a stagehand to walk on the stage to repair a lost connection. Quintal testified that he was "satisfied that in [Fuhrmann's] opinion ... the action ... could have been done in a more subtle manner, perhaps in between the numbers, but certainly not during an act." At the time

---

2. It is unclear from the record whether Fuhrmann was referring to Ahuna's responsive email to Orias, which Furhmann received a copy of, or whether Furhmann was referring to a separate response from the union to his "letter." The record, however, does not contain either Furhmann's letter or the union's response to such a letter. Ahuna also did not reference either document in his emails to Orias and in his letter to Quintal after the ban was instituted.

he wrote the August 31 letter, he was not aware of Nephi's interactions with the stage crew at the rehearsals and the concert.

On September 3, 2007, Ahuna informed Minton and Stanley of Quintal's decision to ban them from working at the NBC and the Waikiki Shell. This was the first time that Minton and Stanley were made aware of the City's investigation into their conduct at the concert.

Stanley was scheduled to begin working at a long-term position on The Lion King show at the NBC concert hall the next day. The Lion King show was planned to run for two to three months. Stanley testified that he had "substantiated several times with the business agent" that he would work on the show for its entire run. However, as a result of the ban, Stanley was not allowed to work on the show. The president of an employee leasing company in Honolulu testified that the stagehand who was hired to work in the same position as Stanley earned $19,280.63 for working on the show, at an hourly rate of $24.82 for regular time and $37.23 for overtime.

On September 4, 2007, Ahuna replied by letter to Quintal, protesting that Quintal's "unilateral action to prohibit two of my members from performing work at City and County of Honolulu venues is simply wrong." He expressed his understanding that the "quality of the sound system and the movement and coordination of the sidemen for the Mayor's portion of the program appears to be the principle [sic] complaint against my members." He explained that these problems were caused by several factors, including "the fact that the promoter ... did not make the necessary provisions for the type of system which was needed to accommodate the Mayor's performance with a back up band." In addition, "the promoter failed to schedule a sound check prior to the performance[,]" and the union members were not informed of the Mayor's rehearsal the night before the show.

Ahuna also wrote, "One of the critical issues here is that the Mayor's brother made mention on several occasions that he wanted a PA system like that used by the Society of Seven for their shows." However, the City's sound system "falls way short of what was being requested." The union members "suggested to the event coordinator that perhaps they should consider supplementing the City's system with professional sound equipment rental which would accommodate the vision as expressed by the Mayor's brother[.]"

Ahuna's letter concluded by asking Quintal to consider "temporarily suspend[ing]" his decision "for a period of at least 2 weeks" and holding an "immediate meeting to discuss this matter in greater detail," given the "differing perceptions on what went wrong[.]" Ahuna's letter also attached statements by Stanley, Lyons and a third stagehand who had worked at the event. Stanley's statement explained the reasons for the occasional feedback during the performance.

The parties stipulated at trial that there was "no indication that either of the plaintiffs ... specifically authorized or did not authorize Mr. Ahuna or the union to ... write the response letter on their behalf." Despite Ahuna's request that Quintal defer the effective date of the ban pending a meeting, Quintal's ban became effective immediately.

Minton worked at an event for Hawai'i Pacific University (HPU) on August 16, 2007 at the NBC concert hall, prior to Quintal's ban. HPU's coordinator sent an email to Fuhrmann on September 4, 2007, thanking him for the work that had been done and specifically identifying and thanking Minton for his "expert advice and consultation." Minton testified that another HPU event was planned for later in 2007 but that he was unable to work at the event due to the City's ban.

On September 6, 2007, a representative of the Hawai'i State Teachers Association (HSTA) wrote to Ahuna, requesting Minton and Stanley to work at an event to be held on October 8, 2007 at the NBC arena. She wrote that Minton and Stanley "are excellent workers and know the requirements of the job[.]" The representative later told Minton that she was unable to hire him because of the City's ban.

Minton testified that once he discovered that the City was involved, he attempted to

contact City officials himself. On September 7, 2007, Minton sent a letter to Quintal regarding Quintal's August 31, 2007 letter. Minton wrote that he was "extremely aggrieved by statements" in Quintal's letter. He wrote, "I formally state that I performed in a professional manner to insure, first personnel safety, second protection of the facility equipment, and then the protection of rented equipment, to present the best event possible[.]" Quintal confirmed that he received the letter, but he did not respond because he "felt it was best" to communicate with Ahuna.

On September 11, 2007, Minton and Stanley sent a joint letter to Quintal objecting to the actions taken. There is no indication in the record that Quintal responded to this letter.

On October 2, 2007, Quintal wrote a memorandum to file, explaining the actions that had been taken thus far. He wrote that his decision to ban Minton and Stanley was based on their "demeanor" at the event. Specifically, they failed to "portray a level of customer service and professionalism that would be expected from individuals with over thirty-five years of experience." According to Quintal, the problem with the event was not "that equipment was not on par or that the act did not coordinate last minute changes properly." Rather, the issue was "the 'way' these two individuals responded to requests for assistance from the promoter and act participants as well, that has caused this action to be known."

Quintal further wrote that "[t]o date, no apology has been submitted on behalf of IATSE or the individuals involved." Regarding the permanence of his decision, Quintal wrote, "Rather than a permanent work restriction, I have since indicated that I would reconsider their participation at Blaisdell or Shell events after a nine month term." The memorandum provided that Fuhrmann had communicated Quintal's reconsideration to Ahuna.

On October 5, 2007, Fuhrmann responded to a request by the Hawai'i Catholic Schools to have Minton and Stanley work at an event scheduled for February 1, 2008 at the NBC arena. After discussing the request with Fuhrmann, Quintal instructed Fuhrmann to inform the organization that Minton and Stanley were not allowed to work at the NBC facilities. Fuhrmann complied, informing Hawai'i Catholic Schools that Minton and Stanley "are not presently permitted to work in the facilities of the [NBC]" and advising them to have the union provide "two other qualified stage hands." Hawai'i Catholic Schools responded by asking Furhmann to reconsider and permit Minton and Stanley to work at the event, given their history of working together.

Two months after the ban had been imposed by Quintal, in a letter to the Mayor dated November 2, 2007 and stamped received on November 26, 2007, the emcees for the event complained generally about the technical support and sound quality at the concert.[3]

### C.

Petitioners filed their complaint in circuit court on December 13, 2007. The complaint alleged that Quintal and Fuhrmann had acted as agents of the City, and had abused their authority "through their wrongful, tortious and illegal conduct[.]" Petitioners also alleged that Respondents denied them due process by "blacklist[ing]" them from working at the City's facilities without "a deprivation hearing ... and/or the right to contest" the action. "In the exercise of reasonable care, [the City] should have cancelled and overruled ... Quintal's and Fuhrmann's illegal directives," but "failed to correct, rectify and rescind" them. Petitioners alleged that "Quintal's and Furhmann's illegal directives and Defendants' failures to rescind them have interfered with Plaintiffs' prospective advantage, prospective business relationships and contracts with producers." As a result, "Plaintiffs have been deprived of work for

---

3. The letter was not received into evidence during the trial, although there was some testimony referencing the letter. Counsel for the City later represented to the circuit court that despite writing the letter, Sprinkle "did not want to be involved in the matter." The emcees did not specifically identify Minton or Stanley in their letter.

various producers, have lost income and have lost the intense enjoyment working in their occupation and profession ordinarily brought them."

Petitioners sought "[p]reliminary and permanent mandatory injunctions, together with other equitable relief," requiring the City to immediately "rescind the blacklisting, [and] notify the producers of its illegality[.]" In addition, Petitioners sought a judgment against Respondents, jointly and severally, for general and special damages, punitive and exemplary damages, and reasonable attorneys' fees and costs.

On December 24, 2007, Petitioners filed a Motion for Preliminary Injunction against Respondents. The memorandum in support of the motion stated that "[b]ecause the vast majority of theatrical, concert and event productions performed in Honolulu are situated at the City facilities from which the Plaintiffs have been banned, they have essentially been put out of work." In addition, the memorandum noted that Petitioners would "suffer irreparable injury because the extent of their lost income will not be provable, since it is difficult to project what employment would have been granted them by different employers but for the ban" and "producers usually hire the same crews they used for their last productions."

The City filed its Answer to the Complaint on January 3, 2008 and its Memorandum in Opposition to the Motion for Preliminary Injunction on January 4, 2008. The City contended in opposition to the Motion for Preliminary Injunction that Petitioners were not blacklisted; "[r]ather, the City notified the Plaintiffs' union that Plaintiffs would no longer be permitted to work at City-owned facilities due to unprofessional behavior which they exhibited while working at a City facility." According to the City, "This behavior caused alarm to the individuals to whom it was directed and the actions taken against Plaintiffs were taken in order to prevent similar incidents from occurring again." The City emphasized that Petitioners were not City employees, "so any action allegedly taken against them, was at the hands of their union, not the City."

The hearing on the Motion for Preliminary Injunction was held on January 14 and 15, 2008.[4] The court considered as evidence the various correspondence exchanged between Ahuna, Orias, Quintal, and Minton.[5]

Fuhrmann testified on behalf of the City, and stated that the decision to blacklist Minton and Stanley "was [a] response not so much to the technical problems of the show as it was the approach." He further explained, "The complaint was about the individuals not taking action to deal with the show and to not respond to the tenants. They [the AMM] were concerned about their appearance on the show since they were seen in the public; they were not dressed ... in what we consider a public manner." According to Fuhrmann, the issue was that Lyons wore a T-shirt. He stated that he never spoke directly with Minton or Stanley during his "investigation" but "had their written side of the story."

Fuhrmann testified that the decision to ban Minton and Stanley was made by Quintal. However, in response to questions posed by the court, Fuhrmann testified that the Mayor was "consulted" and agreed with Quintal's decision.[6]

Quintal also testified at the hearing. Like Fuhrmann, Quintal testified that the reason for his decision was not necessarily the "tech-

---

4. The Honorable Sabrina S. McKenna presided. The transcript of the hearing was made part of the record of the trial. The circuit court took judicial notice of the transcript.

5. The correspondence included: 1) 8/21/07 emails between Ahuna and Orias regarding sound problems at the event; 2) 8/31/07 letter from Quintal to Ahuna informing Ahuna of Quintal's decision to ban Petitioners; 3) 9/4/07 Ahuna reply letter to Quintal regarding ban, with attachments; 4) 10/26/07 letter from Minton to Mayor; 5) 10/26/07 Counsel for Petitioners' letter

to Quintal asking for immediate withdrawal of directive; 6) 11/2/07 letter from emcees to Mayor; 7) 12/10/07 Ahuna letter to Quintal informing Quintal that Petitioners had retained counsel and the union's involvement was limited.

6. When the Mayor was later asked about Fuhrmann's testimony at his deposition, he testified, "No, I did not approve the action." Minton testified at trial that he did not learn of the Mayor's involvement until the preliminary injunction hearing.

nical aspects" of the show but "the demeanor and the response from the plaintiffs in dealing with the customers who were asking them for their professional support[.]" In regard to Minton's "demeanor," Quintal explained that "Minton did not get off his chair, he did not move, he just sat there." Quintal further explained that Minton "responded negatively" to certain requests and "allowed another employee to work on stage behind the Mayor to [work] on the alleged technical difficulties, causing . . . a gap in the sound[.]"

Quintal acknowledged that he did not have any special training as a theatrical production expert, and his only knowledge, particularly with respect to the propriety of permitting a sound technician to go on stage during a performance, came from watching performances as an audience member. Quintal did not know why Minton sent Lyons on stage and testified that he did not "feel it was necessary" to know.

In regard to Stanley, Quintal testified that Stanley "did not come out of the sound booth or come down to address the problem during the performance[.]" Quintal explained that during his "investigation," "it was implied and . . . conveyed" to him that if there were sound problems, either the Mayor or Jeff Coelho [7] "wanted [Stanley] to come down so that he could see firsthand what the problems were with the sound."

At the conclusion of the hearing, the court orally granted Petitioners' Motion for Preliminary Injunction. The court commented that there were no "threats of violence, or profanity," or anything of that nature that prompted the City's ban. Rather, "[t]here were glitches that could have been avoided" if the union members "had been invited perhaps to the two full rehearsals[.]" Additionally, the court stated that it seemed that the City's action was "overreaching . . . particularly when we are talking about the liveli-

hoods [of] many people." Thus, this was "an action that cannot be allowed to continue."

The court's written order granting the preliminary injunction was filed on January 23, 2008.

In June 2008, the City installed a new sound system at the NBC concert hall. According to Quintal, the new sound system had "been in the works for almost six years" prior to that.

On January 21, 2010, Respondents filed a Motion for Partial Summary Judgment on the Plaintiffs' Due Process Claim. The question to be decided by the motion was whether the City denied Petitioners due process of law when Quintal barred them from working at City-owned and operated facilities.[8] On March 19, 2010, the circuit court entered its order denying the Motion for Partial Summary Judgment.[9]

### D.

A jury-waived trial was held on April 12, 14, 15 and 16, 2010.

Minton testified that during the period of time between the City's ban and the court's injunction, eighty percent of his previously available work was no longer available. Other than the NBC facilities, the only other "real house" is the Hawai'i Theater, which is "non-union." Thus, he had "just a tiny percentage of [his] business available[.]" Minton explained that the other venues the City alleged were available to him during the ban were not actually available. For example, several of the venues were school facilities that for the most part hired students rather than professionals, and were "insignificant as far as professional theater." He had also never worked at several of the theaters referenced by the City.

Minton also testified that he had nearly exhausted his union pension fund due to his lost income and that he had no other signifi-

---

7. Fuhrmann testified at the hearing that Coelho was present with the Mayor backstage and "is a person that's been in radio and doing shows for probably 20 something, 30 years."

8. Respondents argued that due process was satisfied because Petitioners and Ahuna, their union representative, had knowledge of the nature of

the complaints regarding the show and were given an opportunity to respond in Ahuna's August 21, 2007 email to Orias and September 4, 2007 letter to Quintal.

9. The Honorable Rom A. Trader presided.

cant assets. He had taken any work that was offered to him through the union since he was blacklisted. Minton explained that he did not seek work outside the union's referral system because he had taken an oath upon joining the union that he would not seek any non-union work.

Stanley testified that prior to the blacklisting, his reputation was "[e]xcellent." However, after Quintal's August 31, 2007 letter, his reputation was "blown to hell." Stanley further testified that the amount of work he had been able to get since the blacklisting was "severely reduced," about "a tenth to a quarter" of the work he had been able to get before the blacklisting.

Orias testified that in his experience, Minton and Stanley were both always "[p]olite and courteous." He had never received any complaints about either Minton or Stanley. He testified that if he had the opportunity to do another production, he would choose Minton and Stanley to work for him.

Sean Christensen, a line technician and member of the Local 665 Union for approximately twenty years, testified that he had previously served as vice-president and trustee of the union. In his view, the City's ban "became common knowledge throughout the industry." He estimated that he spoke in-person to twenty to thirty union members about the ban.

Christensen testified that Minton was "considered very highly ... amongst his peers." Minton's reputation as a union secretary and treasurer prior to the ban "was outstanding." Minton was "widely respected not only within our own local, but within the international, so he was well thought of and very, very skilled and knowledgeable in his duties and responsibilities in that office." In Christensen's opinion, the ban "impacted [Minton] adversely, because he was not allowed to work, and it reflected negatively on his capacity and his career."

Christensen testified that he had also known Stanley for about twenty-five years. Stanley's reputation as a stagehand prior to the ban was "exemplary," and Stanley "used to be known as the sound guy in that house." After the ban, Stanley's work calls went to different people and he stopped getting the calls that he had been given in the past.

Christensen further testified that although other jobs at non-City venues are technically available, "primarily most of their [Petitioners'] work was done at the City venues, either the Shell, the arena or the Blaisdell complex." He "definitely" agreed that Minton and Stanley "specialized in events that have large audiences and large theaters." He estimated that although Minton and Stanley had worked at the Stan Sheriff Center, Aloha Stadium and other outdoor venues, about ninety percent of their work came from the NBC facilities and the Shell. To his knowledge, no other member of the union had ever been banned from working by the City.

Thomas Loudat, Ph.D., testified regarding Minton and Stanley's lost income as a result of the ban. He was originally retained by the City to evaluate Minton's and Stanley's lost income, but the parties reached a mutual agreement that he would perform the calculations for both sides. The parties stipulated that Dr. Loudat was "an expert in economics" and would be "permitted to render any and all opinions that would relate to that expertise."

Dr. Loudat explained that his typical procedure was to gather case-specific information such as tax returns and benefits information from the union. He would then use that information to "specify or show what the nature of the earnings of the individuals had been historically," in order to project what the individuals would have earned "but for the incident." He also factored in "general economic conditions" and long-term "trends" for jobs in the relevant sector. He testified that Petitioners' income had remained constant over a long period of time, in spite of a "gradual downtrend" in the "arts and entertainment sector of the Honolulu economy." Dr. Loudat's calculations did not account for any specific events, such as The Lion King show, which Petitioners may have worked at if not for the ban. The calculations were based "solely on the historic average," with adjustments due to "economic conditions."

Based on his analysis, Dr. Loudat produced reports on Minton's and Stanley's pro-

jected lifetime loss of earnings. He concluded that Stanley's total pay loss after 2007 amounted to $405,000, which was comprised of $266,000 in compensation loss, $109,000 in Federal income tax on that amount, and $30,000 in State income tax on that amount. He concluded that between August 18, 2007 and January 14, 2008, the date of the preliminary injunction hearing, Stanley's lost earnings amounted to $2,653.

Using the same analysis, Dr. Loudat concluded that Minton's total pay loss after 2007 amounted to $329,000 ($219,000 compensation loss). He concluded that between August 18, 2007 and January 14, 2008, Minton's lost earnings amounted to $4,058.

In addition to the testimony referenced above, Quintal testified that after he wrote the letter banning Minton and Stanley, he "chatted with the Mayor with regards to . . . allowing them to return." According to Quintal, "I said there's a possibility that if we can work things out with the union going forward, I would reconsider my decision."

Quintal testified that he did not communicate to Minton and Stanley that he would "back off," or communicate with them at all during the process of banning them and then reconsidering. He communicated only with Ahuna, informing Ahuna that he would reconsider his decision if the union made a "more concerted effort in educating . . . members" working at the City's facilities.

Quintal reiterated that "the real basis" for his decision to ban Minton and Stanley was "customer service and professionalism." He stated, "in part of my conducting my investigation with folks, I was led to believe that there was some personal feelings about arrogance, some rudeness, some inconsiderations." He attributed these comments to Jeff Coelho, "statements from Gary Sprinkle," and "discussions with John Furhmann over his discussions about what had happened" with Ahuna.

Respondents' counsel confirmed the City's position that its legal authority for the ban arose from Section 6–702 of the Revised Charter of the City and County of Honolulu (RCCCH), which grants the director of the DES the authority to "operate and maintain" DES facilities and to "perform such other duties as may be required by law."

## E.

The circuit court entered its Findings of Fact; Conclusions of Law and Order on October 28, 2010.

First, the circuit court found that as members of the IATSE, Petitioners "are for all intents and purposes 'free agents' who engage in their trade without any contractual obligations or rights relative to the City." The court thus found "the decision to ban Plaintiffs was a legitimate exercise of the City's authority to prescribe conditions for the use of . . . the NBC."

In regard to the nature of the City's investigation, the court found that "Quintal assigned Furhmann to investigate the complaints and concerns raised" by Orias, the Mayor, and the event emcees, and that this investigation "included input from Minton and Stanley." Although the court acknowledged that "Fuhrmann at no point had direct contact or communication with either Minton and Stanley" during the course of his investigation, the court found that under the circumstances, "it was reasonable for the City to raise and discuss any concerns related to the August 18, 2007 show with the union."

The court found that "although [Petitioners] were not formally provided with an exhaustive list" of the "complaints and issues raised in connection with the poor quality of the show," nevertheless Petitioners, "through their union representatives, were generally provided with notice." The court reasoned that both Minton and Stanley were aware of Orias' August 21, 2007 email, and "through their union representatives, were provided with an opportunity to submit information concerning the complaints." The court therefore found that "[t]he overall process provided by Quintal, Fuhrmann and the City consisted of meaningful notice of the complaints against Minton and Stanley; [and] contained an opportunity for Minton and Stanley, by and through their business agent and union representatives, to respond to the complaints against them[.]" The court further found that the "overall process" "con-

tained a deliberative decision-making process that was reasonably based upon information provided by the parties herein."

Regarding Petitioners' right to work at and access the City's facilities, the court entered a finding that "it is clear that Plaintiffs have no constitutionally-protected right, no contract-based right, no city, state or federal statutory right, nor any other cognizable legal right or entitlement to ply their chosen profession as stage/theater workers at City-owned venues."

As to the effect of the ban on Minton and Stanley's ability to continue working, the court found that Petitioners remained "completely free to perform their respective trades at City venues (other than the NBC or Waikiki Shell), as well as, at non-City venues." The court found that "[w]hile both Minton and Stanley certainly have a long history, practice and expectation of traditionally working certain recurring events or those put on by certain promoters or groups, neither Minton nor Stanley provided adequate proof that they had any existing" or prospective "contract with any party which was interfered with" due to Respondents' actions. As such, the court found· that Petitioners' claim that the ban "resulted in significant economic losses to them" was "speculative since it is based largely upon their expectation that they would have worked many, if not all, of the events that they either had previously worked or for which they would have been otherwise eligible and available to do so."

Based on the above findings, the court made a series of "alternative" conclusions. First, the court concluded that Petitioners "failed to present credible evidence that a constitutionally-protected property interest was denied them," and therefore Petitioners' "due process ... and state constitutional claims fail."

"In the alternative," the court concluded that Quintal and Fuhrmann were entitled to qualified immunity regarding the federal and constitutional claims and to conditional privilege on the state law claims. Thus, judgment on those claims was entered in their favor.

"In the second alternative," the court concluded that Minton and Stanley failed to prove that they were denied due process of law. The court concluded in this regard that Minton and Stanley received "adequate notice for purposes of due process," "both directly and through their union representatives, as to the complaints stemming from the August 18, 2007 event," and Respondents provided "a meaningful process to challenge the complaints[.]"

The court further concluded under its "alternative" ruling that Petitioners "failed to present credible evidence to establish that they had existing or prospective contractual rights with Catholic Schools of Hawai'i and/or [HPU]." "In the alternative, Plaintiffs failed to present credible evidence that any Defendant interfered with any existing or prospective contractual right or any existing or prospective business advantage." The court also concluded that "Plaintiffs had no contract with the City and thus, have no enforceable contract or other rights to work at any City-owned venues, including the NBC and the Waikiki Shell." The court consequently entered judgment in favor of Respondents "as to claims predicated upon these theories."

The court therefore entered judgment in favor of Respondents and against Petitioners on all claims in the complaint and rescinded the order granting Petitioners' Motion for Preliminary Injunction.

## II.

### A.

On appeal to the ICA, Petitioners raised thirty points of error challenging the circuit court's findings of fact and conclusions of law. In relevant part, the ICA consolidated Petitioners' points of error into two claims that the circuit court erred in entering its judgment because 1) the ban on Petitioners was not authorized by statute or regulation; and 2) the ban was a denial of procedural due process.[10]  *Minton v. Quintal,* No. CAAP–

---

10.   Petitioners also argued that the City's ban was      arbitrary and capricious. The ICA rejected this

11–0000317, 128 Hawai'i 497, 2012 WL 5970950, at *2 (Haw.App. Nov. 29, 2012) (memo.).

With respect to the first issue, Petitioners argued that government officials may not interfere with private employment decisions without explicit statutory authority to do so. In this case, the City relied solely on RCCCH § 6–702, which Petitioners argued "is far from the explicit grant of authority to overrule private employers' staffing decisions" because "[o]perating and maintaining a building does not normally even implicitly entail the power to decide whom a lessee may employ." In response, Respondents maintained that the Director's authority to operate and maintain DES facilities was a sufficient legal basis for suspending Petitioners' access to the facilities.

In regard to the second issue, Petitioners contended that their rights to procedural due process were violated. Petitioners argued that a liberty interest was implicated in this case, where access to publicly-owned facilities was denied, eligibility for employment was formally denied, the City's action interfered with Petitioners' relationship with third parties, and finding replacement work was not possible because large shows for which Petitioners' services were required were held at the NBC and Waikiki Shell. Petitioners asserted that they were denied procedural due process prior to the deprivation of their liberty interest, as the "only pre-deprivation notice" they received was from Orias, which was "extremely misleading" because it "looked like a simple inquiry." They argued that the full extent of the Respondents' accusations was never communicated to them.

Relatedly, Petitioners argued that the circuit court erred in concluding and finding that they failed to provide adequate proof of Respondents' interference with existing or prospective contracts, and also erred in find-

ing that any claims of economic losses as a result of the ban was "speculative."

Respondents countered that Petitioners failed to establish a constitutionally protected liberty interest. [AB at 15] Respondents contended that "an employee must have no capacity to practice his or her career at all" and the employee's termination must be accompanied "by stigmatizing charges[.]" (Quotation marks omitted). In this case, Petitioners "could still work at other events at other publicly and privately owned venues," and the reasons for banning Petitioners were not publicized.

Even assuming that Petitioners established a liberty interest, Respondents argued that they "provided constitutionally adequate due process prior to" the decision to institute the ban. Alternatively, Respondents maintained that due process is not required in cases involving the termination of an at-will employee, who is subject to termination without any explanation.

### B.

The ICA affirmed the circuit court's judgment, holding that 1) Respondents had inherent authority to suspend Petitioners from DES facilities; and 2) Petitioners failed to demonstrate a property or liberty interest in working at the DES facilities. *Minton*, 2012 WL 5970950, at *2–4.

First, the ICA held that "[t]he authority to suspend persons from DES's facilities is inherent and necessarily incidental to the operation and maintenance of those facilities." *Id.* The ICA interpreted RCCCH § 6–702 "as conferring upon the director the ability to exclude persons as necessary to the operations and management of the DES's facilities." [11] *Id.*

argument based on its determination that Petitioners failed to demonstrate a liberty or property interest. *Minton*, 2012 WL 5970950, at *4. In light of our ruling upon the issue of procedural due process, we do not further address this point of error.

11. The ICA further held that Quintal's decision to ban Petitioners did not constitute rule-making and thus was not subject to the requirements of

the Hawai'i Administrative Procedures Act (HAPA), HRS Chapter 91 and RCCCH § 4–105 (requiring notice and hearing for rules and regulations). *Id.* The ICA reasoned that HAPA does not apply to decisions relating to the "internal management of an agency," and RCCCH § 4–105 only applies to rules and regulations affecting the public. *Id.*

---

**184**

Second, the ICA held that Petitioners failed to demonstrate that they had "a liberty interest in being allowed to work at DES's facilities." *Id.* at *3–4. A liberty interest was not implicated when a person " 'is not rehired in one job but remains as free as before to seek another.' " *Id.* at *3 (quoting *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 575, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Rather, in order "[t]o prove constitutional injury, one must show that the government has worked some change in his status under law, sufficient to implicate a liberty interest." *Id.*

Applying this standard, the ICA concluded that Petitioners "did not demonstrate that the government's action constrained [their] future employment opportunities to a sufficient degree to constitute a status change of due process import." *Id.* at *4. The court reasoned that the City's ban "in no way prescribes Appellants' rights to practice their profession in the private sector, nor does it impair Appellants' eligibility for public employment at any other venue." *Id.* Thus, the ICA concluded that the City's ban did not implicate Petitioners' due process interests. *Id.*

The ICA therefore affirmed the circuit court's judgment. *Id.*

### III.

In their application for writ of certiorari to this court, Petitioners raised three questions for review: 1) whether Quintal had "the explicit authority to exercise unbridled discretion" to prohibit Petitioners from working at City facilities without affording them due process; 2) whether Quintal's action interfered with Petitioners' property interest in their employer-employee and union-member relationships; and 3) whether Quintal's action abridged Petitioners' liberty interest in working in their chosen profession.

### IV.

### A.

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case.

Thus, we review questions of constitutional law under the right/wrong standard." *Brown v. Thompson,* 91 Hawai'i 1, 8, 979 P.2d 586, 593 (1999) (quotation marks and citations omitted).

### B.

■ Findings of fact will not be disturbed unless clearly erroneous. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.

We review the trial court's conclusions of law de novo under the right/wrong standard. Under this standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it. Thus, a conclusion of law is not binding upon the appellate court and is freely reviewable for its correctness.

*Brown,* 91 Hawai'i at 8, 979 P.2d at 593 (quotation marks, brackets, ellipses and citations omitted).

### V.

The City's primary defense to its actions in this case is that the City's ban was authorized as a proper exercise of its power to manage and maintain its facilities. Accordingly, we address the issues raised by Petitioners' application in the following order: 1) whether the City had the authority to ban Petitioners in the first instance; 2) assuming the City had such authority, whether the ban satisfied the requirements of the Hawai'i Constitution; and 3) if the ban was not constitutionally sufficient and therefore cannot be justified as part of the City's authority to manage and maintain its facilities, whether Petitioners' tortious interference claims were properly decided by the circuit court.

■ The first issue raised by Petitioners' application is whether Quintal had the authority to prohibit Petitioners from working at the City's facilities without affording them due process. RCCCH § 2–101 (2001) provides that the "city shall have and may exercise all powers necessary for local self-

399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Due Process Clause] to secure." *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915). *See Martin v. Mem'l Hosp.*, 130 F.3d 1143, 1148 (5th Cir.1997) ("The Due Process Clause protects an individual's liberty interest which is viewed as including an individual's freedom to work and earn a living[.]") (quotation marks, ellipses and citation omitted).

Accordingly, courts have held that the right to pursue one's chosen profession free from unreasonable government interference comes within the liberty concept of due process. *See Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ("the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the liberty and property concepts of the Fifth Amendment") (quotation marks and citations omitted); *Truax*, 239 U.S. at 38, 36 S.Ct. 7 (at will employee "has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will"); *Mead v. Independence Ass'n*, 684 F.3d 226, 232 (1st Cir. 2012) ("The right to hold private employment and to pursue one's chosen profession free from unreasonable government interference is encapsulated in the liberty concept of the Due Process Clause."); *Stidham v. Texas Comm'n on Private Sec.*, 418 F.3d 486, 491 (5th Cir.2005) ("We have confirmed the principle that one has a constitutionally protected liberty interest in pursuing a chosen occupation.").

On one hand, merely losing one position in a profession without being "foreclosed from reentering the field" is generally not sufficient to demonstrate an infringement of a liberty interest. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C.Cir.1994). For example, in *Board of Regents of State Colleges v. Roth*, the Court held that it would "stretch[ ] the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." 408 U.S. 564, 575, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth*, a professor was hired by a public university for a fixed term of one academic year. *Id.* at 566–67, 92 S.Ct. 2701. After the term had expired, the university informed the professor that he would not be rehired; the university gave no reason for the decision and no opportunity to challenge the decision. *Id.* at 568, 92 S.Ct. 2701. The professor had no tenure rights to continued employment, and state law "clearly [left] the decision whether to rehire a nontenured teacher for another year to the unfettered discretion of university officials." *Id.* at 566–67, 92 S.Ct. 2701. Based on these facts, the Court held that the professor's liberty interest was not implicated and he was not entitled to procedural due process. *Id.* at 575, 92 S.Ct. 2701.

Similarly in *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court found no liberty interest in continued employment, where the plaintiff lost her employment at one location but otherwise remained free to pursue her profession at other locations. In that case, the plaintiff was a short-order cook at a cafeteria operated by a private employer on a military installation engaged in developing highly classified weapons systems. *Id.* at 887, 81 S.Ct. 1743. The commanding officer of the installation revoked the plaintiff's identification badge upon determining that she had failed to meet the security requirements for that specific installation. *Id.* at 888, 81 S.Ct. 1743. Consequently, the plaintiff was not permitted to enter the military installation. *Id.* On these facts, the Court found that the plaintiff's right to follow a chosen trade or profession was not affected, as she "remained entirely free to obtain employment as a short-order cook or to get any other job, either with [her employer] or with any other employer. All that was denied her was the opportunity to work at one isolated and specific military installation." *Id.* at 895–96, 81 S.Ct. 1743.

However, "the plaintiff may demonstrate that the government's action precludes him—whether formally or informally from such a broad range of opportunities that it interferes with his [or her] constitutionally protected right to follow a chosen trade or profession." *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C.Cir. 1995) (emphases added) (quotation marks, citation and brackets omitted). "In other words, government action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests ... when that preclusion is ... sufficiently broad." *Id.*

In *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377, the government revoked a defense contractor's security clearance based on confidential reports that were not made available to the contractor. *Id.* at 477–80, 79 S.Ct. 1400. The contractor was not given an "opportunity to confront and question persons whose statements reflected adversely on him or to confront the government investigators who took their statements." *Id.* at 479, 79 S.Ct. 1400. Without his security clearance, the contractor was unable to obtain comparable employment in the aeronautics field. *Id.* at 486–87, 79 S.Ct. 1400. Although the Court ultimately decided the case on statutory grounds,[13] the Court stated that the contractor's "work opportunities have been severely limited on the basis of a fact determination rendered after a hearing which failed to comport with our traditional ideas of fair procedure," *id.* at

508, 79 S.Ct. 1400, and indicated that the case involved "substantial restraints on employment opportunities[.]" *Id.* at 506–07, 79 S.Ct. 1400.

The District of Columbia Circuit has interpreted *Greene* to require a plaintiff to show that the government's action has "seriously affected, if not destroyed, his [or her] ability to obtain employment in [his or her] field." *Taylor*, 56 F.3d at 1506 (quoting *Greene*, 360 U.S. at 492, 79 S.Ct. 1400) (quotation marks and brackets omitted). The court compared *Greene* with *Cafeteria & Restaurant Workers*, and held that the "misconduct must substantially reduce the value of [the plaintiff's] human capital, as it would if his skills were highly specialized and rendered largely unmarketable as a result of the agency's acts." *Id.* at 1507.

In terms of informal government preclusion, courts have also held that foreclosing a person from an occupation by denying that person "collateral credentials or privileges practically necessary for pursuing an occupation is ... actionable" as a deprivation of a liberty interest. *Phillips v. Vandygriff*, 711 F.2d 1217, 1223 (5th Cir.1983) (citing *Greene*, 360 U.S. 474, 79 S.Ct. 1400) (emphasis added), *reh'g granted in part*, 724 F.2d 490 (5th Cir.1984).[14] *See Silver v. Castle Mem'l Hosp.*, 53 Haw. 475, 483–84, 497 P.2d 564, 571 (1972) (doctor applying for staff privileges at a publicly funded hospital "has an interest in being able to pursue his profession[,] which requires that the necessary fa-

**13.** The Court held that "in the absence of explicit authorization from either the President or the Congress the respondents were not empowered to deprive petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." *Id.* at 508, 79 S.Ct. 1400. In light of its conclusion, the Court held that it need not determine whether the contractor had been "restrained in the enjoyment of constitutionally protected rights" and if so, whether the contractor "was accorded due process of law." *Id.* at 492–93, 79 S.Ct. 1400.

Nevertheless, *Greene* has been cited as recognizing a due process right to pursue a chosen profession free from unreasonable government interference. *See Chernin v. Lyng*, 874 F.2d 501, 505 (8th Cir.1989) ("Although ... *Greene* was decided on statutory grounds, it is clear from the Court's opinion that its decision to read a hearing requirement into the relevant statutes result-

ed from the 'serious constitutional problems' which arose from the agency's failure to provide for the due-process rights of those affected."); *Phillips v. Vandygriff*, 711 F.2d 1217, 1223 (5th Cir.1983) (citing *Greene* for proposition that denying a person collateral credentials or privileges necessary for pursuing an occupation is actionable under due process).

**14.** The Fifth Circuit granted rehearing in part in *Phillips*, clarifying the scope of its original holding "that, at a minimum, due process guarantees to an applicant facing a licensing process notice and an opportunity to be heard." 724 F.2d at 492–93. The court "declined to determine the precise scope of the due process rights possessed by an applicant confronting a de facto licensing process" and "[left] it to the district court ... to decide" whether the "form of accessibility" provided in that case "could fulfill the requirements of due process." *Id.* at 493.

cilities be available to him," and is entitled to procedural due process); *Martin*, 130 F.3d at 1149 ("Appellant might be foreclosed from practicing as a nephrologist in Harrison County . . . if such foreclosure is the natural consequence of denying Appellant collateral credentials necessary for pursuing his occupation[.]") (quotation marks, brackets, ellipses and citations omitted).

In this case, Petitioners' right to pursue their chosen professions as stagehands was directly and unambiguously interfered with by the City's ban. Unlike in *Roth* and *Cafeteria Workers*, Petitioners did not merely lose one position as a result of the City's ban. Rather, Minton and Stanley had a history of being employed as stagehands specializing in large-scale stage productions, and were categorically prohibited from working for any employer at the City's facilities, where the vast majority of large-scale productions in the city are held. As a result of the City's ban, private employers, such as Orias, The Lion King production, the HSTA, HPU, and Hawai'i Catholic Schools, were prevented from freely hiring Minton and Stanley as stagehands for their events.

Because of the close connection between Petitioners' professions and the City's facilities, prohibiting Petitioners from accessing those venues effectively foreclosed their ability to take advantage of employment opportunities. The natural consequence of the City's ban was that Minton and Stanley were denied privileges that were "practically necessary" to pursuing their chosen occupations. *See Phillips*, 711 F.2d at 1223; *Silver*, 53 Haw. at 484, 497 P.2d at 571. The City's ban "seriously affected, if not destroyed," Petitioners' abilities to obtain employment in their field, and "substantially reduce[d] the value" of their human capital. *Taylor*, 56 F.3d at 1506–07.

■ The ICA failed to consider the City's interference in the employer-employee relations of Minton and Stanley. Rather, the ICA focused largely on the lack of a contract underlying Minton's and Stanley's work at the City's facilities, in determining that they

had no constitutionally protected liberty interest in continuing to work at the City's facilities. *Minton*, 2012 WL 5970950, at *3. However, the lack of a contract is not dispositive. At-will employees are protected from "outside interference in their employment, and this right provides a constitutional cause of action when a government agent unlawfully interferes with the employment relation." *Chernin v. Lyng*, 874 F.2d 501, 505 (8th Cir.1989).

The adverse effect of the City's ban on Minton's and Stanley's future employment opportunities was so prevalent and comprehensive that it implicated a liberty interest under article I, section 5 of the Hawai'i Constitution.[15] Accordingly, the circuit court clearly erred by finding that Petitioners remained "completely free to perform their respective trades," and that Petitioners "have no constitutionally-protected right . . . to ply their chosen profession as stage/theater workers at City-owned venues." The ICA erred in affirming the circuit court by determining that Petitioners failed to assert a cognizable liberty interest. *Minton*, 2012 WL 5970950, at *4.

### B.

■ "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). " 'Due process is flexible and calls for such procedural protections as the particular situation demands.' " *Kernan v. Tanaka*, 75 Haw. 1, 22, 856 P.2d 1207, 1218 (1993) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)) (brackets omitted).

The appropriate process due in a situation requires consideration of three distinct factors: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and (3) the govern-

---

**15.** Given our conclusion that Petitioners demonstrated a cognizable liberty interest, we do not reach the question of whether the City's ban also implicated a property interest under the Hawai'i Constitution.

ment's interest, including the function involved and the fiscal or administrative burdens that the additional procedures would entail.

*In re Herrick*, 82 Hawai'i 329, 343, 922 P.2d 942, 956 (1996) (citing *Kernan*, 75 Haw. at 22–23, 856 P.2d at 1218–19).

■ "At its core, procedural due process of law requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant liberty interest." *State v. Bani*, 97 Hawai'i 285, 293, 36 P.3d 1255, 1263 (2001). Thus, this court has held that an "elementary and fundamental requirement of due process" is "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Herrick*, 82 Hawai'i at 343, 922 P.2d at 956 (quoting *Klinger v. Kepano*, 64 Haw. 4, 10, 635 P.2d 938, 942 (1981)). *See Brown v. Thompson*, 91 Hawai'i 1, 10, 979 P.2d 586, 595 (1999) (notice "must inform affected parties of the action about to be taken against them as well as of procedures available for challenging that action.") (quotation marks and citation omitted). Comparatively, in the context of doctors being denied staff privileges at hospitals, this court held that procedural due process requires an informal hearing before the deciding board, timely notice, and a written statement specifying the basis upon which privileges were being denied. *Silver*, 53 Haw. at 484–85, 497 P.2d at 571. Thus, the City was required, at a minimum, to provide notice and opportunity to be heard to Petitioners.

The City's ban was imposed through Quintal's August 31, 2007 letter to Ahuna. According to Quintal's letter, the reason for the ban was that Minton and Stanley "showed a complete disregard" in the areas of "customer service and professionalism."

However, prior to Quintal's letter, Petitioners were not given any notice that the City was considering sanctioning them in relation to the AMM event, much less that the City was considering a ban. Based on their experience at the concert and based on Orias' emails after the show, Petitioners were aware of the technical sound problems at the concert but had no knowledge that they, rather than the City's sound system, would be held responsible for those problems. Petitioners had no knowledge that there were additional allegations regarding their demeanor, response to requests by Nephi, and their attire at the concert.

There is no dispute that City officials did not speak to Petitioners as part of their "investigation." Adequate notice of the complaints against Petitioners was also not provided through the union's involvement in the matter. Ahuna's emails to Orias contained comments by Minton and Stanley, but were clearly limited to responding to the technical sound problems raised by Orias. Orias's emails never referenced the stage crew's demeanor or customer service. Thus, the fact that Minton and Stanley were aware of Orias's concerns as to the sound system quality did not provide them with any notice regarding the complaints of "customer service and professionalism," which formed the "real basis" of the City's ban.

Although Quintal and Fuhrmann met with the union business agent and president the day before the ban was instituted, the purpose of the meeting was only to inform them of Quintal's decision. The meeting was short and there was no "real discussion" on the matter. The union personnel were not present in a capacity to advocate for Petitioners. Moreover, based on Ahuna's letter in response to Quintal's letter banning Petitioners, it is clear that Ahuna was still under the impression that the "quality of the sound system and the movement and coordination of the sidemen for the Mayor's portion of the program appears to be the princip[al] complaint against my members." His letter consequently did not address undisclosed allegations that Minton and Stanley were rude or unprofessional. Thus, the union's involvement in the process did not provide any meaningful notice to Minton and Furhmann of the pendency of the City's ban or the basis for the ban.

As a result of the lack of notice, Minton and Stanley were not given an opportunity to rebut the allegations made against them. *Cf. Greene*, 360 U.S. at 496, 79 S.Ct. 1400

("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

Providing notice and an opportunity to be heard was especially important in this case, where the key decisions were made by two individuals, Fuhrmann and Quintal, who were not present at the AMM concert and who relied upon allegations of third persons, including the Mayor. *See Herrick*, 82 Hawai'i at 343, 922 P.2d at 956 (appropriate process due in a situation requires consideration of "the risk of erroneous deprivation of [private] interest through the procedures used"). Petitioners, however, were not told of the nature of their "unprofessional" conduct and who had made these allegations, and they were not given an opportunity to provide explanations concerning such matters as their interactions with Nephi, their attire, and their decisions at the concert.

Additionally, Petitioners were not given a hearing or its equivalent, and were not permitted even an informal meeting with City officials to discuss the allegations against them. After Quintal's letter, Ahuna requested that Quintal temporarily suspend his decision for two weeks and hold an immediate meeting to discuss the matter in greater detail, given the "differing perceptions on what went wrong" at the show. However, such a meeting was never held.

Viewing the record as a whole, it is apparent that Respondents had no interest in providing Petitioners an opportunity to be heard, although there appeared to be appropriate explanations for all of the allegations of unprofessionalism that purportedly formed the basis of the ban. Quintal specifically testified that he did not "feel it was necessary to know" why Minton sent Lyons onto the stage during the concert.

Under these circumstances, it is clear that Petitioners were denied the most "elementary and fundamental requirement of due process": notice of the charges against them and an opportunity to voice their objections in a meaningful time and manner before governmental deprivation of a significant liberty interest. The lack of due process in this case is particularly egregious when considering that Petitioners' livelihoods were at stake. *See id.* (due process requires consideration of "private interest that will be affected by the official action").

Accordingly, the circuit court clearly erred by finding that Petitioners were "generally provided with notice" through the union, and that the "overall process provided by Quintal, Fuhrmann and the City consisted of <u>meaningful notice</u> of the complaints against Minton and Stanley" and "<u>contained an opportunity for Minton and Stanley ... to respond to the complaints against them</u>[.]" (Emphases added).

The circuit court also erred in concluding "in the second alternative" that Minton and Stanley received "adequate notice for purposes of due process" and "a meaningful process to challenge the complaints against them." The record in this case makes it apparent that the City conducted its investigation without once contacting Petitioners and that regardless of the union's involvement, Petitioners were uninformed of the pendency of the City's ban and the "real basis" for the ban, and were denied any meaningful opportunity to rebut the allegations made against them.

Consequently, the ICA erred in affirming the circuit court's judgment.

## VII.

Based on the foregoing, we hold that Petitioners established a violation of their protected liberty interests under article I, section 5 of the Hawai'i Constitution, and further established that procedural due process was not afforded prior to the City's ban. Thus, the City's ban cannot be justified as an exercise of its authority to operate and maintain its facilities, and Petitioners are entitled to a mandatory injunction rescinding the City's ban.

■ Additionally, because the City's ban was not a proper use of the City's authority to manage its facilities, such authority cannot be raised as a defense to Petitioners' un-

derlying tort claims. We thus address Petitioners' claim that Respondents tortiously interfered with their "prospective advantage, prospective business relationships and contracts with producers." *See Kahale v. City & Cnty. of Honolulu,* 104 Hawai'i 341, 349, 90 P.3d 233, 241 (2004) ("the City is subject to the state's tort laws in the same manner as any other private tortfeasor").

■ The elements of the tort of intentional interference with prospective business advantage are:

(1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

*Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.,* 113 Hawai'i 77, 116, 148 P.3d 1179, 1218 (2006) (quoting *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.,* 91 Hawai'i 224, 258, 982 P.2d 853, 887 (1999)).[16]

■ The first element requires "a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship. The prospective economic relationship need not take the form of an offer but there must be specific facts proving the possibility of future association." *Haw. Med. Ass'n,* 113

Hawai'i at 116, 148 P.3d at 1218 (quoting *Locricchio v. Legal Servs. Corp.,* 833 F.2d 1352, 1357 (9th Cir.1987)) (quotation marks omitted). *See* Restatement (Second) of Torts § 766B cmt. c (1979) ("The relations protected against intentional interference" include "interferences with the prospect of obtaining employment").

In this case, Petitioners alleged tortious interference with their prospective business advantage with "producers." The evidence adduced at trial established that Petitioners had colorable economic relationships with third parties, including the producers of The Lion King show, Hawai'i Catholic Schools, the HSTA, and HPU.

Second, the City had " 'actual knowledge' of the expectancy or 'knowledge of facts which would lead a reasonable person to believe that such interest exists,' " *Haw. Med. Ass'n,* 113 Hawai'i at 116, 148 P.3d at 1218 (citation omitted), as evidenced by the written requests to the City for Minton and Stanley to work for the HSTA and Hawai'i Catholic Schools, and the testimony regarding Minton's inability to work at the HPU event and Stanley's inability to work on the Lion King show.

■ Third, the City intentionally interfered with such prospective business advantage by banning Petitioners from working at the City's facilities. The intent element "denotes purposefully improper interference and requires a state of mind or motive more culpable than mere intent." *Id.* (quotation marks and citations omitted). "In other words, the plaintiff must prove that the defendant either pursued an improper objective

---

**16.** This court has previously suggested that the tort of interference with prospective contractual relations is a sub-species of, or otherwise distinct from, the broader tort of interference with prospective economic advantage. *See Buscher v. Boning,* 114 Hawai'i 202, 216 n. 8, 159 P.3d 814, 828 n. 8 (2007) ("In *Kutcher v. Zimmerman,* the ICA noted that 'the tort of interference with prospective contractual relations is a sub-species of the broader tort of interference with prospective economic advantage.' ") (quoting 87 Hawai'i 394, 405 n. 15, 957 P.2d 1076, 1087 n. 15 (App. 1998)); *Whitey's Boat Cruises, Inc. v. Napali–Kauai Boat Charters, Inc.,* 110 Hawai'i 302, 317 n. 25, 132 P.3d 1213, 1228 n. 25 (2006) ("In addition to the elements required to establish a

claim for tortious interference with prospective business advantage, a plaintiff asserting a claim for tortious interference with prospective contractual relations must also prove that 'the defendant acted without proper justification.' ") (citing *Kutcher,* 87 Hawai'i at 406, 957 P.2d at 1088). Inasmuch as Petitioners satisfy the elements of the tort of "interference with prospective business advantage" as set forth in *Hawai'i Medical Ass'n,* we need not address whether "interference with prospective contractual relations" is a sub-species of, or otherwise distinct from the tort of "interference with prospective business advantage," whether their respective elements differ, or whether Petitioners satisfy the elements of the former.

of harming the plaintiff or used wrongful means that caused injury in fact." *Id.* (quotation marks and citation omitted).

In this case, the City's ban violated Petitioners' due process rights and therefore used wrongful means to cause injury to Petitioners. *Cf.* W.P. Keeton et. al, *Prosser and Keeton on the Law of Torts* § 129, at 982 (5th ed. 1984) (defining intent element of the tort of interference with contract and stating that once "knowledge of the plaintiff's contract or interest" is established, "the defendant may be held liable for an interference with the plaintiff's known economic interests if the defendant invades those interests by . . . unconstitutional acts") (footnotes omitted).

Finally, the City's interference impaired Petitioners' economic relationships with the third party producers and caused actual damages to Petitioners in the form of lost employment and wages, as demonstrated by Dr. Loudat's testimony. Thus, Petitioners established legal causation and the existence of actual damages. *See Haw. Med. Ass'n,* 113 Hawai'i at 116, 148 P.3d at 1218.

The circuit court therefore erred in finding that any claim that Petitioners suffered "significant economic losses" as a result of the ban was "speculative since it is based largely upon their expectation that they would have worked many, if not all, of the events that they either had previously worked or for which they would have been otherwise eligible and available to do so." The circuit court also clearly erred in finding that neither Minton nor Stanley "provided adequate proof that they had any prospective contract with any party which was interfered with due to the Defendants' actions herein."

The court thus erred in concluding that Petitioners "failed to present credible evidence to establish that they had . . . prospec-

tive contractual rights with Catholic Schools of Hawaii and/or Hawaii Pacific University" and alternatively "failed to present credible evidence that any Defendant interfered with any . . . prospective business advantage[.]"

The evidence was uncontradicted that Furhmann specifically communicated with Hawai'i Catholic Schools and informed them that Minton and Stanley were not permitted to work at the requested event, and further instructed Hawai'i Catholic Schools to seek other workers from the union. The evidence was also undisputed that the City's ban directly interfered with Petitioners' ability to work at other scheduled events, including the Lion King production and the HPU and HSTA events. Additionally, the evidence of the financial effect of the ban upon Minton and Stanley was adduced by an expert agreed upon by the parties. The City offered no substantive evidence showing that the ban did not interfere with Petitioners' prospective business advantage; rather, the City's primary argument was that the City's ban was a proper use of its authority to manage and maintain the City's facilities. However, we have rejected this contention and concluded that the City's ban was not proper because it was imposed without affording due process to Petitioners and therefore imposed in a manner that derogated their individual rights under the Hawai'i Constitution.

■ Accordingly, we conclude that Petitioners established the elements of their claim of tortious interference with prospective business advantage, including the existence of damages. We therefore remand to the circuit court for a determination of the amount of damages to be awarded against the City.[17] *See Estate of Klink v. State,* 113 Hawai'i 332, 337, 152 P.3d 504, 509 (2007) (vacating judgment and holding based on the record that State was negligent and liable to

17. The course of the proceedings in this case indicated that Petitioners were suing Quintal and Furhmann in their official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (noting in the context of claims brought under 42 U.S.C. § 1983, "In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. The course of proceedings in such cases typically will indicate the nature of liability sought to be imposed.") (quotation marks and citation omitted).

"Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* at 165, 105 S.Ct. 3099 (citing *Monell v. New York City Dep't of Social Servs.;* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Petitioners alleged in their Complaint that Quintal and Furhmann "acted as agents of [the City] within their perception of the scope of their positions, on account of which [the City] is liable

the plaintiffs as a matter of law and remanding on the issue of damages); *Brown v. Thompson*, 91 Hawai'i 1, 979 P.2d 586 (1999) (vacating and deciding several claims as a matter of law and assessing damages).

## VIII.

Based on the foregoing, the judgments entered by the circuit court and the ICA are vacated and the case is remanded to the circuit court for proceedings consistent with this opinion.

for the individual defendants' wrongful, tortious and illegal conduct[.]"

During closing arguments at trial, the circuit court indicated that it was its understanding that all of the claims against Quintal and Fuhrmann were being made in their official capacity. Respondents' counsel stated that he had based his case and arguments "[t]o a large degree" on the understanding that the claims were official-capacity claims, and argued, "[I]f they're just suing them in their individual capacity, it would change." Petitioners' counsel did not indicate whether the claims were official-capacity or personal-capacity claims in his rebuttal.

In the parties' briefs to the ICA, the parties raised arguments regarding whether Quintal and Furhmann were entitled to qualified immunity. In Respondents' answering brief to the ICA, how-ever, Respondents noted that the circuit court had not made a ruling granting the City immunity. In Petitioners' reply brief, Petitioners responded that there is "no disagreement at this time that the City is not immune" and stated that "[t]he immunity issue has, from a practical point of view, become inconsequential and should therefore be disregarded."

Finally, at oral argument, Petitioners' counsel indicated that he was uninterested in pursing claims against Quintal and Fuhrmann if successful on claims against the City. MP3: Oral Argument, Hawai'i Supreme Court, at 1:01:07 (Jun. 19, 2013), *available at* http://state.hi.us/jud/oa/13/SCOA_061913_11317.mp3.

Accordingly, we treat Petitioners' suit as an official-capacity suit and we do not address the question of qualified immunity.