**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000032
10-MAR-2016
07:51 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI‘I

---o0o---

ERIC J. MINTON and RICHARD M. STANLEY,
Plaintiffs/Appellees/Cross-Appellants,
v.
SIDNEY A. QUINTAL, JOHN C. FUHRMANN, and CITY AND COUNTY OF
HONOLULU, Defendants/Appellants/Cross-Appellees,
and
JOHN DOES 1-10 and DOE ENTITIES 1-10, Defendants

NO. CAAP-15-0000032

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 07-1-2354)

MARCH 10, 2016

FOLEY, PRESIDING J., FUJISE AND REIFURTH, JJ.

OPINION OF THE COURT BY FOLEY, J.

Defendants/Appellants/Cross-Appellees Sidney A.
Quintal, John C. Fuhrmann, and the City and County of Honolulu
(collectively, **C&C**) appeal and Plaintiffs/Appellees/Cross-
Appellants Eric J. Minton (**Minton**) and Richard M. Stanley
(**Stanley**) cross-appeal from the "Final Judgment and Order
Determining Damages" entered on December 23, 2014 in the Circuit

Court of the First Circuit[1] (**circuit court**).

On appeal, C&C contends the circuit court erred in calculating the amount of damages it awarded, and challenges the circuit court's (1) use of the "Worst Case" scenario to measure Minton and Stanley's damages; (2) reliance on Minton and Stanley's supplementary declarations; and (3) the denial of C&C's March 12, 2014 "Motion to Conduct Trial, Conduct Further Discovery, and Receive Further Evidence on Issue of Damages" (**Motion to Conduct Further Discovery and Trial**).

On cross-appeal, Minton and Stanley contend the circuit court erred in (1) "determining the scope of the remand from the [Hawai'i] Supreme Court"; (2) "denying foreseeable non-pecuniary damages"; and (3) striking parts of the declarations by Stanley and Minton.

## I. BACKGROUND

This case comes before us after remand from the Hawai'i Supreme Court to the circuit court "for a determination of the amount of damages to be awarded against [C&C]." Minton v. Quintal, 131 Hawai'i 167, 192, 317 P.3d 1, 26 (2013).[2] The supreme court concluded that Minton and Stanley "established the elements of their claim of tortious interference with prospective business advantage, including the existence of damages." Id.

On March 12, 2014, following the supreme court's decision, C&C filed a Motion to Conduct Further Discovery and Trial. The circuit court held a hearing on this motion on April 4, 2014. On April 24, 2013, the circuit court issued its "Order Granting in Part and Denying in Part [C&C's Motion to Conduct Further Discovery and Trial] Filed March 12, 2014."

On May 2, 2014, C&C filed a memorandum summarizing the testimony presented to the trial court during the initial trial in 2010. On May 5, 2014, C&C filed supplemental exhibits, which included reports from economist Thomas A. Loudat, PhD (**Dr.**

---

[1] The Honorable Karen T. Nakasone presided.

[2] A thorough factual and procedural background of this case may be found in Minton, 131 Hawai'i at 170-82, 317 P.3d at 4-16.

**Loudat**) on the updated estimates of the projected earnings of Minton and Stanley.[3]  On May 6, 2014, Minton and Stanley submitted their own memorandum summarizing the testimony from the 2010 trial.

On June 23, 2014, Minton and Stanley each submitted "supplementary declarations" to the circuit court (**Supplemental Declarations**).  On June 30 2014, C&C submitted objections to the Supplemental Declarations.  The circuit court held a hearing on the admission of the Supplemental Declarations on July 3, 2014, at which it struck portions of both Minton and Stanley's Supplemental Declarations.

On July 7 and 8, 2014, the circuit court conducted an evidentiary hearing receiving testimony from Stanley, Minton, and Dr. Loudat.

On October 15, 2014, the circuit court entered its Findings of Fact, Conclusions of Law, and Order Determining Damages (**2014 FOFs/COLs**).  The circuit court awarded $556,156 to Minton and $194,483 to Stanley.  The circuit court denied non-economic damages to Minton and Stanley, citing the limited scope of the supreme court's remand.

C&C submitted their notice of appeal on January 16, 2015.  Minton and Stanley submitted their notice of cross-appeal on January 29, 2015.

## II.   STANDARDS OF REVIEW

### A.   Findings of Fact (FOFs) and Conclusions of Law (COLs)

> [An appellate] court reviews the trial court's FOFs under the clearly erroneous standard.  <u>Ueoka v. Szymanski</u>, 107 Hawai'i 386, 393, 114 P.3d 892, 899 (2005) (citations omitted).

> An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.  An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding.  We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

---

[3] C&C submitted revised versions of the reports on May 28, 2014.

Bremer v. Weeks, 104 Hawaiʻi 43, 51, 85 P.3d 150, 158 (2004) (quoting Beneficial Hawaiʻi, Inc. v. Kida, 96 Hawaiʻi 289, 305, 30 P.3d 895, 911 (2001)).

Bhakta v. Cty. of Maui, 109 Hawaiʻi 198, 208, 124 P.3d 943, 953 (2005) (brackets in original omitted).

> We review the trial court's conclusions of law de novo under the right/wrong standard. Under this standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it. Thus, a conclusion of law is not binding upon the appellate court and is freely reviewable for its correctness.

Minton, 131 Hawaiʻi at 184, 317 P.3d at 18 (quoting Brown v. Thompson, 91 Hawaiʻi 1, 8, 979 P.2d 586, 593 (1999)). "[A] COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawaiʻi, 106 Hawaiʻi 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks omitted) (quoting Allstate Ins. Co. v. Ponce, 105 Hawaiʻi 445, 453, 99 P.3d 96, 104 (2004)).

**B. Admissibility of Evidence**

"As a general rule, [an appellate] court reviews evidentiary rulings for abuse of discretion." Sierra Club v. Dep't of Transp. of State of Hawaiʻi, 120 Hawaiʻi 181, 197, 202 P.3d 1226, 1242 (2009) (citing Kealoha v. Cty. of Hawaiʻi, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993)). "However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under [Hawaii Rules of Evidence (**HRE**) Rules 401 (1993) and 402 (1993)], [an appellate] court applies the right/wrong standard of review." Sierra Club, 120 Hawaiʻi at 197, 202 P.3d at 1242 (citing Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 104, 176 P.3d 91, 103 (2008)).

**C. Motion to Conduct Further Discovery and Trial**

"We review a trial court's ruling limiting the scope of discovery under the abuse of discretion standard." Fisher v. Grove Farm Co., 123 Hawaiʻi 82, 94, 230 P.3d 382, 394 (App. 2009) (reviewing a motion to compel discovery) (citing State v. Fukusaku, 85 Hawaiʻi 462, 477-78, 946 P.2d 32, 47-48 (1997)). An

4

abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

## III. DISCUSSION

### A. Economic Damages

#### 1. Motion to Conduct Further Discovery and Trial

C&C challenges the circuit court's denial of C&C's Motion to Conduct Further Discovery and Trial. C&C argues that in denying the motion, "the circuit court prevented [C&C] from rebutting the self-serving testimony of [Minton and Stanley] . . . ."

On remand, the circuit court allowed C&C to conduct further discovery on issues that had arisen since the 2010 trial.[4] C&C was given the opportunity to cross-examine Minton, Stanley, and Dr. Loudat at the evidentiary hearing. C&C does not cite any rule or other authority that would require the circuit court to allow additional discovery upon remand from an appellate court on the issue of damages. C&C has failed to demonstrate that the circuit court clearly exceeded the bounds of reason or disregarded rules or principles of law to its substantial

---

[4] The circuit court denied most of C&C's requests for additional discovery, but allowed further discovery on a few issues. C&C requested to depose Minton and Stanley "on the issue of mitigation of damages and to ascertain to what extent they have rehabilitated themselves professionally." The circuit court granted the request, but limited the depositions "to occurrences that have taken place since the 2010 trial." C&C also requested "discovery on whether [Minton and Stanley] refused to and continue to refuse to work, despite an opportunity to do so." The circuit court denied "except for occurrences after the 2010 trial." C&C requested that they be allowed to "consult experts to testify on the issue of mitigation of damages and the extent to which [Minton and Stanley] should have rehabilitated their careers." The circuit court denied "except for [Dr. Loudat] and limited to post-2010 trial." C&C requested an additional deposition of Dr. Loudat "concerning the meaning of his expert reports and the extent to which [Minton and Stanley] should have rehabilitated their career." The circuit court granted, "only in that Dr. Loudat shall prepare new reports which shall be presented to the Court and all parties no later than May 2, 2014. Depositions shall be limited to matters that are new or different from Dr. Loudat's March 2010 reports[.]" Finally, on C&C's request to "[o]btain and admit into evidence updates of Dr. Loudat's reports and/or figures[,]" the circuit court granted and repeated its limitations that "[d]epositions shall be limited to matters that are new or different from Dr. Loudat's March 2010 reports[.]"

detriment. See Amfac, 74 Haw. at 114, 839 P.2d at 26.

### 2. "Worst Case" Scenario

C&C argues that the circuit court erred in adopting the "Worst Case (actual) earnings" analysis provided by Dr. Loudat for Minton and Stanley's damages awards.

#### a. Minton

Dr. Loudat's report generated multiple estimates of projected earnings. First, Dr. Loudat identified two models to estimate Minton's earnings as if he had not been banned from working at city-owned facilities. The "Mr. Minton Specified" model was based on the assumption that Minton's "earnings but for the incident would have changed through 2014 according to Honolulu entertainment sector job changes that have actually occurred and Mr. Minton's historic average annual earnings increase." Dr. Loudat noted that the "Mr. Minton Specified" analysis took into consideration Minton's social security retirement payments "at a level exceeding his current level due to assumed higher estimated earnings." In comparison, the "Social Security Work Slowdown" model used the same projected values as the "Mr. Minton Specified" model (i.e. based on Honolulu entertainment sector job changes and Minton's historic average annual earnings increase) from the date of the incident until Minton turned sixty-six and became eligible for social security benefits. This model uses Minton's actual earnings, which were at the time of the report equal to his social security retirement benefits.

Second, Dr. Loudat provided two scenarios tracking Minton's earnings after 2007, taking into consideration that Minton had been banned from working at city-owned facilities. The "Worst Case" scenario estimates Minton's earnings based on what he actually earned, and are "reduced forward in time after 2013 such that they become $0 at age 77."[5] The "Best Case" scenario estimates Minton's earnings as if Minton had performed

---

[5] Dr. Loudat reported that "[Minton's] post-incident earnings since the incident of 2007 have averaged only 12% of his earnings in 2007. Currently his earnings are approximately 18% of his 2007 earnings."

to normative expectations--that is, "commencing in 2008, year 1 after the incident year of 2007, Mr. Minton's earnings should have been 69% of estimated no incident increasing to 83% of no incident by 2013, or in five years, then continuing to increase at the same rate from 2013 until they are equal to the no incident earnings level."[6]

Dr. Loudat then provided four estimates of the difference in Minton's salary due to his employment termination. Dr. Loudat began with one of the first set of models estimating Minton's salary had he not been banned from working at a city-owned facility, and subtracting from the first model one of the models from the second set estimating Minton's salary after he had been banned by C&C. The projections range from $54,000 to $556,000.

In its 2014 FOFs/COLs, the circuit court held:

> 3. The court's damage award for [Minton's] claim of tortious interference with prospective business advantage, is based on the 5/5/2014 updated report by economist [Dr. Loudat's,] testimony before this court on 7/7/2014, and testimony from [Minton].
>
> 4. The court finds and concludes that the "Mr. Minton Specified" analysis is appropriate.
>
> 5. The court finds and concludes that the "Worst Case (actual) earnings" analysis is appropriate.
>
> 6. On the tortious interference with prospective business advantage claim, the court awards [Minton] $556,156.00 as the total award.

C&C challenges the circuit court's use of the "Worst

---

[6] Dr. Loudat's report stated:

> Normative data related to job loss due to circumstances similar to [Minton's] (i.e. wrongful termination) indicates the following.
>
> > The average year 1 earnings loss due to a job loss equals approximately 31%. [Minton's] was 88%.
> >
> > The average earnings loss 5 years after a job loss equals 17%. [Minton's] was 85% exceeding not only the normative average but also the highest earnings loss measured in the studies of 50%.
> >
> > [Minton's] post-2007 earnings performance was significantly less than normative expectations.

(Bullet points omitted.)

7

Case" model. C&C's argument is essentially that Minton failed to mitigate his damages, and that the circuit court should have picked the estimate of damages based on the average employee whose employment had been terminated in the relevant sector. Assuming, without deciding, that Minton was under a duty to mitigate his damages, C&C fails to provide evidence that Minton did not mitigate his damages. C&C alleges, without support, that "there should not have been much difficulty [for Minton] in securing recommendations for work in Las Vegas." Instead of pointing to evidence that Minton failed to apply to or accept positions in his relevant field, C&C points only to evidence that Minton did worse than Dr. Loudat's projected normative estimate of how a person in Minton's position should have performed subsequent to being banned by C&C from working at city-owned facilities. On this argument, C&C fails to demonstrate either that the circuit court's conclusion is not supported by substantial evidence or that we should otherwise be left with a definite and firm conviction that a mistake has been made. See Bhakta, 109 Hawai'i at 208, 124 P.3d at 953.

Furthermore, C&C posits that the "Worst Case" scenario was inconsistent with Dr. Loudat's recommendation that the "Best Case" scenario "more closely fit [Dr. Loudat's] economic prediction or economic expertise to a reasonable degree of probability . . . ." C&C's argument is, in essence, that the circuit court erred because it did not adopt Dr. Loudat's recommended estimation of Minton's economic damages.

C&C also challenges Minton's credibility. "[A]n appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence[.]" Amfac, 74 Haw. at 117, 839 P.2d at 28 (internal quotation marks omitted) (quoting Nani Koolau Co. v. K & M Constr., Inc., 5 Haw. App. 137, 140, 681 P.2d 580, 584 (1984)).

C&C argues that "[t]he circuit court was wrong in concluding that [Minton and Stanley] never were reinstated from their suspension or ban from the Neal Blaisdell Center and Waikiki Shell," but the circuit court did not make such a

finding, whether implicit or explicit.

Additionally, C&C argues, "by choosing the 'Worst Case' scenario, the circuit court necessarily adopted [Minton and Stanley's] erroneous arguments that it was [C&C], and not the Promoters and/or the Union who were instrumental in 'hiring hall' practices[.]" This argument is without merit. The circuit court did not make such a finding.

### b. Stanley

Dr. Loudat also generated multiple estimates of Stanley's projected earnings. The first set of projected earnings models measured Stanley's earnings had he not been banned from working at city-owned facilities. The "Mr. Stanley Average" model took into account Stanley's average earnings, and estimated how it would "have changed through 2014 according to the Honolulu [Consumer Price Index] and Honolulu entertainment sector job changes."[7] The "Mr. Stanley Earnings Trend" model estimated Stanley's earnings "according to their long-term linear trend, which . . . decrease[d] at an average annual rate of $643."[8]

The second set of projected earnings models took into consideration that Stanley had been banned from working at city-owned facilities in 2007. Under the "Worst Case" scenario, "[Stanley's] earnings after 2007 are those that actually occurred, which are reduced forward in time after 2013 such that they become $0 at age 77." Under the "Best Case" scenario, "[Stanley] would have performed equivalent to normative expectations. This means that commencing in 2008, year 1 after the incident year of 2007, [Stanley's] [earnings] would have been 69% of estimated no incident increasing to 83% of no incident by

---

[7] Dr. Loudat's report states, "[Stanley's] pre-incident earnings for inflation shows average annual earnings inclusive of unemployment of approximately $44,000. These are 2014-dollar amounts. [Stanley's] fluctuations above and below this average were unrelated to changes in the Honolulu entertainment sector. Rather, they were specific to [Stanley]."

[8] Dr. Loudat reports that "[Stanley's] earnings working in the Honolulu entertainment sector from 1990 through 2007 had ups and downs but overall decreased at an average annual rate of $$643 [sic]."

2013, or in five years."

The circuit in its 2014 FOFs/COLs held:

> 7.   The court's damage award for [Stanley's] claim of tortious interference with prospective business advantage, is based on Dr. Loudat's 5/6/2014 updated report, Dr. Loudat's testimony before this court on 7/7/2014, and testimony from [Stanley].
>
> 8.   The court finds and concludes that the "Trend earnings" analysis is appropriate.
>
> 9.   The court finds and concludes that the "Worst Case (actual) earnings" analysis is appropriate.
>
> 10.   On the tortious interference with prospective business advantage claim, the court awards [Stanley] $194,483.00 as the total award.

C&C challenges the circuit court's decision to use the "Worst Case" scenario to measure Stanley's projected earnings after he had been banned from working at city-owned facilities. C&C's sole argument specific to Stanley's award of damages is that Stanley performed better after his employment was terminated than the normative projection, according to Dr. Loudat's report.[9] Like C&C's challenge to the circuit court's award of damages for Minton, C&C merely disagrees with the circuit court's choice in earnings projection, and does not provide a basis for us to determine that the circuit court's determination was either unsupported by substantial evidence or that we should otherwise be left with a definite and firm conviction that a mistake has been made.  See Bhakta, 109 Hawai'i at 208, 124 P.3d at 953.

---

[9] Dr. Loudat's updated reported stated,

> Normative data related to job loss due to circumstances similar to [Stanley's] (i.e. wrongful termination) indicates the following.
>
>> The average year 1 earnings loss due to a job loss equals approximately 31%. [Stanley's] was 29%.
>>
>> The average earnings loss 5 years after a job loss equals 17%. [Stanley's] was 0% due to his shoulder injury but currently is approximately 14%.
>>
>> [Stanley's] post-2007 earnings performance comports with normative expectations.

(Bullet points omitted.)

B.  Non-economic Damages

1.  Scope of Remand

Minton and Stanley challenge the circuit court's determination that an award of non-economic damages[10] would be outside of the scope of the Hawai'i Supreme Court's remand.  In its 2014 FOFs/COLs, the circuit court stated:

> 11.  This court will not award non-economic damages because the Hawai'i Supreme Court limited the remand to economic damages.  See Minton, 131 Hawai'i at 192 (holding that "[C&C's] interference impaired [Minton's and Stanley's] economic relationships with the third party producers and caused actual damages to [Minton and Stanley] in the form of lost employment and wages. Thus, [Minton and Stanley] established legal causation and the existence of actual damages."
>
> 12.  The [Hawai'i] Supreme Court's explicit instruction on remand was, because [Minton and Stanley] "established the elements of their claim of tortious interference with prospective business advantage, including the existence of damages, we therefore remand to the circuit court for a determination of the amount of damages to be awarded against the City."  Id.
>
> 13.  The [Hawai'i] Supreme Court clearly referenced economic damages throughout its opinion.  Non-economic damages were never mentioned by the Court.

(Emphases, parenthetical, brackets and ellipsis omitted.)  Minton and Stanley argue, "the passage from the [supreme court] decision that the [circuit court] relied on and quoted [in] its decision does not support the notion that the [supreme court] intended to rule out non-pecuniary damages."  Minton and Stanley assert, "It is very well-established that damages for emotional distress and loss of enjoyment are available to victims of interference with prospective business relations."

C&C argues in response that the circuit court was correct in limiting the scope of remand to lost employment and wages.  C&C relies primarily on the supreme court's conclusion:

> Finally, the [C&C's] interference impaired [Minton's and Stanley's] economic relationships with the third party producers and caused actual damages to [Minton and Stanley] in the form of lost employment and wages, as demonstrated by Dr. Loudat's testimony.  Thus, [Minton and Stanley]

---

[10] Under Hawaii Revised Statutes § 663-8.5(a) (1993), "[n]oneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other non-pecuniary losses or claims."

established legal causation and the existence of actual
damages.

Minton, 131 Hawai'i at 192, 317 P.3d at 26.

Our reading of the supreme court's decision, however,
does not limit remand on the issue of damages to "lost employment
and wages." In remanding the case to the circuit court, the
supreme court stated, "[W]e conclude that [Minton and Stanley]
established the elements of their claim of tortious interference
with prospective business advantage, including the existence of
damages. We therefore remand to the circuit court for a
determination of the amount of damages to be awarded against
[C&C]." Minton, 131 Hawai'i at 192, 317 P.3d at 26. The
language quoted by C&C to justify the limitation of the circuit
court's scope of remand was related to the supreme court's
analysis of the fifth element of the tort of interference with
prospective business advantage,[11] and was not meant to limit the
scope of remand. The element "actual damages" does not bear on
type or extent of the remedy available to a plaintiff. The
supreme court remanded the case to the circuit court on the issue
of damages, so that the circuit court could determine what type
of remedy Minton and Stanley were entitled to. The circuit
court's conclusion that the supreme court limited its remand to
economic damages is wrong. See Minton, 131 Hawai'i at 184, 317
P.3d at 18.

---

[11] The supreme court enumerated the elements of the tort of intentional
interference with prospective business advantage:

> (1) the existence of a valid business
> relationship or a prospective advantage or
> expectancy sufficiently definite, specific, and
> capable of acceptance in the sense that there is
> a reasonable probability of it maturing into a
> future economic benefit to the plaintiff; (2)
> knowledge of the relationship, advantage, or
> expectancy by the defendant; (3) a purposeful
> intent to interfere with the relationship,
> advantage, or expectancy; (4) legal causation
> between the act of interference and the
> impairment of the relationship, advantage, or
> expectancy; and (5) actual damages.

Minton, 131 Hawai'i at 191, 317 P.3d at 25 (quoting Hawaii Med.
Ass'n v. Hawaii Med. Serv. Ass'n, Inc., 113 Hawai'i 77, 116, 148
P.3d 1179, 1218 (2006).

## 2. Damages Available for the Tort of Interference with Prospective Business Advantage

The circuit court's erroneous conclusion that non-economic damages were outside the scope of the supreme court's remand would be harmless error if non-economic damages are, as a matter of law, unavailable for the tort of interference with prospective business advantage. Therefore, we evaluate whether non-economic damages are available for such a claim, and hold that non-economic damages that are the common and predictable consequence of the interference are available to a plaintiff asserting interference with prospective business advantage.

In their complaint, Minton and Stanley sought, among other remedies, general damages, special damages, and punitive damages. On appeal, Minton and Stanley argue that the circuit court should have considered damages resulting from Minton's and Stanley's emotional distress. Specifically, Minton and Stanley suggest that the circuit court should have considered "damages for emotional distress, humiliation, loss of congeniality and respect of co-workers and union members, mental stress owing to becoming impoverished due to loss of income over a long time, loss of enjoyment attending concerts and, in [Stanley's] case, having lost his union seniority[.]"

Minton and Stanley's position is that Hawaiʻi courts should adopt Restatement (Second) of Torts §774A (1979) (**Restatement**), which states:

> (1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
>
> (a) the pecuniary loss of the benefits of the contract or the prospective relation;
>
> (b) consequential losses for which the interference is a legal cause; and
>
> (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

C&C argues that aside from the supreme court's remand language, non-economic damages should not be available for the tort of interference with prospective business advantage.

Because Minton and Stanley rely primarily on the Restatement, C&C cite to Meridian Mortg., Inc. v. First Hawaiian Bank, 109 Hawai‘i 35, 122 P.3d 1133 (App. 2005) for the proposition that Hawai‘i courts are hesitant to adopt the Restatement in tort cases. In Meridian, C&C points out, this court declined to adopt the Restatement's position on the tort of interference with contractual relations, and §§ 766 and 767 of the Restatement in particular. Meridian, 109 Hawai‘i at 43-44, 122 P.3d at 1141-42. A year after this court decided Meridian, however, the Hawai‘i Supreme Court published its decision in Hawaii Medical Ass'n v. Hawaii Medical Service Ass'n, Inc., 113 Hawai‘i 77, 148 P.3d 1179 (2006) in which the supreme court used Restatement § 766B to enumerate the elements of the intentional tort of interference with prospective business advantage. Hawaii Medical Ass'n, 113 Hawai‘i at 116, 148 P.3d at 1218 (citing Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 91 Hawai‘i 224, 258, 982 P.2d 853, 887 (1999) (basing in part its statement of the elements of the "tort of intentional or tortious interference with prospective business advantage" on Restatement § 766B)).

C&C also cites California law to oppose recovery of non-economic damages for interference with prospective business advantage. In Di Loreto v. Shumake, 45 Cal. Rptr. 2d 22 (Cal. Ct. App. 1995), a California Court of Appeal held, "emotional distress damages are not routinely recoverable for interference with prospective economic advantage or with contractual relations. Such damages are recoverable for such torts, if at all, in cases where the circumstances of the tortious act make it objectively reasonable that serious emotional distress will be suffered." Id. at 24. The California court did not categorically bar emotional distress damages for tortious interference with prospective business advantage cases. It did hold, however, that the plaintiff had failed to establish "extreme and outrageous" conduct, as required under California law to warrant emotional distress damages. Id. at 26-27. California's approach to damages for tortious interference with prospective business advantage is useful only to the extent that

it emphasizes the element of "extreme and outrageous" conduct in establishing emotional distress damages.

As Minton and Stanley point out, the Oregon Supreme Court considered a similar question to the one before us in Mooney v. Johnson Cattle Co., 634 P.2d 1333 (Or. 1981), whether there is a right to damages for mental suffering in a tort action for inducing breach of contract. Id. at 1334. The Oregon Supreme Court stated,

> The interest in one's occupation . . . often goes beyond the merely economic interest in regular wages or in an advantageous price to include such [non-economic] values as personal associations, love of a place, and pride in one's work that add up to one's sense of identity.
>
> We think, therefore, that recovery of damages beyond pecuniary loss from interference with a contract does not depend only on the presence of intentional interference for an improper objective or by wrongful means, along with causation. Damages for [non-economic] injury depend also on what kind of contractual arrangement is disrupted by defendant and how the claimed injury relates to that kind of arrangement. The mental distress, injured reputation, or other consequential harm not only must have occurred, and have resulted from defendant's interference, it also must have been an injury of a kind that should have been expected as a common and predictable accompaniment of disrupting the type of relationship with which the defendant interfered.

Id. at 1337-38 (citations omitted). The Oregon Supreme Court explicitly rejected the argument that the only type of recoverable damages in commercial dealings are those resulting from the parties' pecuniary interests. Id. at 1338. Instead, the Oregon Supreme Court emphasized its requirement that a plaintiff show that non-pecuniary damages "are common and predictable consequences of [interference with employment] in the type of business setting involved." Id. at 1338. The court noted that the rule it espoused was not entirely consistent with the Restatement's position, explaining,

> [t]o recover either for emotional distress or for harm to reputation in an action for interference with contractual relations, injury of that kind must be a common and predictable result of disrupting the type of relationship or transaction involved rather than a result "reasonably to be expected" in the particular situation[.]

Id. at 1338. The Oregon Supreme Court elaborated,

> Even when serious anxiety and frustration are typical and predictable effects of disruptive interference in a business setting, however, damages are confined to those

15

> effects. Recovery extends only to the mental or emotional distress involved in dealing with the disruption itself. By this test, the stress of finding another buyer or source of supply, of restoring confidence in the future performance of the business, or in case of more fatal interference, of selling or liquidating the enterprise could give rise to damages; distress at personal consequences such as a sacrificed vacation, financial stringency, or family stresses would not.

Id. at 1338-39.[12]

We agree with Oregon's approach to awarding non-economic damages to plaintiffs asserting claims for intentional interference with a prospective business advantage. In the instant case, the circuit court erroneously limited testimony upon remand from the Hawai'i Supreme Court to "general, non-economic damages" and struck portions of Minton's and Stanley's Supplemental Declarations that were relevant to their alleged non-economic damages. We remand to the circuit court with instructions to consider evidence relating to whether Minton and Stanley suffered non-economic damages that were the "common and predictable consequences" of C&C's interference in these circumstances.

### 3. Admissibility of Minton's and Stanley's Declarations

Both parties contest the use of the Minton and Stanley's Supplemental Declarations and other testimony.

C&C argues that the circuit court should have excluded Minton and Stanley's Supplemental Declarations altogether because the circuit court had already made findings of fact and

---

[12] Other jurisdictions have allowed recovery for emotional distress in claims for interference with prospective business advantage, or comparable commercial tort claims. See Nesler v. Fisher and Co., 452 N.W.2d 191, 199-200 (Iowa 1990) ("There was sufficient evidence, even without medical testimony, from which a jury could conclude that [plaintiff] suffered severe emotional distress from the interference, and we hold that it was a proper element of damage, despite the defendants' protestation that such an element of damage should not be allowed in a commercial interference case."); Trimble v. City and Cty. of Denver, 697 P.2d 716, 730 (Colo. 1985) (en banc) ("[Plaintiff] is entitled to mental suffering damages resulting from the torts of fraudulent inducement and intentional interference [with contractual relations.]"); see also Maloney v. Home and Inv. Ctr., Inc., 994 P.2d 1124, 1137 (Mont. 2000) ("That compensable emotional distress would arise from the tortious interference with the [plaintiffs'] rights to the property in question should have been clearly foreseeable by any person professionally involved with such transactions."); Hewitt v. Pitkin Cty. Bank and Trust Co., 931 P.2d 456, 459 (Colo. App. 1995) ("An outrageous conduct claim may lie in a commercial setting.").

conclusions of law based on Minton and Stanley's testimony at the 2010 trial, and because non-economic damages were irrelevant to the circuit court's determination. However, in the FOFs/COLs dated October 28, 2010, the circuit court made only one COL related to damages: "20. [Minton and Stanley's] claim for damages, both economic and non-economic, fail as they have not proven said claims by the requisite legal standard." The supreme court overruled the circuit court's conclusion regarding Minton and Stanley's entitlement to damages under their intentional interference with prospective business advantage claim. Minton, 131 Hawai'i at 192-93, 317 P.3d at 26-27. Therefore, C&C's arguments for excluding the Supplemental Declarations made by Minton and Stanley are without merit.

C&C also argues that Minton and Stanley's Supplemental Declarations were "superfluous and prejudicial" because Dr. Loudat's economic report incorporates information from interviews with Minton and Stanley. Although C&C fails to cite to a specific rule, they presumably challenge the admissibility of the testimony of Minton and Stanley under HRE Rule 403 (1993).[13] C&C has failed to demonstrate that the probative value of Minton and Stanley's declarations was substantially outweighed by the danger of unfair prejudice, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See HRE Rule 403. Therefore, the circuit court did not abuse its discretion in admitting the Supplementary Declarations.

Minton and Stanley contend that the circuit court erred in striking portions of their Supplemental Declarations. The circuit court struck paragraphs three through fourteen of Stanley's Supplemental Declaration on the grounds that "these do not appear to be proper supplementation within the very narrow

---

[13] HRE Rule 403 provides:

> **Rule 403 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

grounds that [the circuit court] had specified." Minton and Stanley provide no support for this contention. Therefore, we hold that the circuit court did not abuse its discretion in striking paragraphs three through fourteen of Stanley's Supplemental Declaration.

The circuit court also struck paragraphs eight and eighteen through twenty-four of Minton's Supplemental Declaration. Minton and Stanley make no discernable argument for the inclusion of these paragraphs. Therefore, we hold that the circuit court did not abuse its discretion in striking paragraphs eight and eighteen though twenty-four of Minton's Supplemental Declaration.

## IV.   CONCLUSION

Therefore, the "Final Judgment and Order Determining Damages" entered on December 23, 2014 in the Circuit Court of the First Circuit is vacated in part and affirmed in part and this case is remanded to the circuit court for further proceedings consistent with this Opinion.


On the briefs:

Matthew S.K. Pyun, Jr.
John P. Moran
Nicolette Winter
(with them on the reply brief)
Deputies Corporation Counsel
City and County of Honolulu
for Defendants/Appellants/
Cross-Appellees.

Charles S. Lotsof
for Plaintiffs/Appellees/
Cross-Appellants.